# IN THE UNITED STATES COURT OF APPEALS
# FOR THE ELEVENTH CIRCUIT

---

CASE NO. 23-13376-F

---

SAMANTHA BANKS, ET AL.,
*Plaintiffs-Appellants*,

v.

GRADY MEMORIAL HOSPITAL CORPORATION,
*Defendant-Appellee*.

---

ON APPEAL FROM THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF GEORGIA
HONORABLE ELEANOR L. ROSS
CASE NO. 1:21-CV-00627-ELR

---

**INITIAL BRIEF OF APPELLANTS SAMANTHA BANKS, ET AL.**

---

**Justin M. Scott**
**Georgia Bar No. 557463**
**RADFORD SCOTT LLP**
**160 Clairemont Avenue, Suite 610**
**Decatur, Georgia 30030**
**(678) 780-4880 | jscott@radfordscott.com**

**Counsel for Appellants Samantha Banks, et al.**

1

*Banks et al. v. Grady Memorial Hospital Corporation – No. 23-13376-F*

## <u>CERTIFICATE OF INTERESTED PERSONS AND CORPORATE DISCLOSURE STATEMENT</u>

Pursuant to FRAP 26.1 and Eleventh Circuit Rule 26.1, the undersigned counsel of record verifies that those persons or entities listed below have or may have an interest in the outcome of this case:

Banks, Samantha – Appellant/Plaintiff

Barnes & Thornburg LLP – Counsel for the Appellee

Cannon, Hon. Regina D., United States Magistrate Judge

Eason, Leslie – Counsel for Appellee

Gordon Rees Scully Mansukhani, LLP – Counsel for the Appellee

Monteiro, Tierra M. – Counsel for Appellants

Myers, Kimberly B. – Counsel for Appellee

Radford Scott LLP – Counsel for Appellants

Ross, Hon. Eleanor L., United States District Court

Sanusi, Amy – Appellant/Plaintiff

Scott, Justin M. – Counsel for Appellants

## <u>STATEMENT REGARDING ORAL ARGUMENT</u>

Counsel for Appellants Samantha Banks, et al., believes that oral argument would benefit the Court because the District Court: (i) misapplied the applicable legal standards, (ii) improperly construed evidence in Appellee's favor, and (iii) ignored critical facts.  This case presents the Court with an opportunity to clarify the proper analysis at the summary judgment stage regarding the decisionmaker's "honest belief" for a challenged employment action.

## TABLE OF CONTENTS

**CERTIFICATE OF INTERESTED PERSONS AND CORPORATE DISCLOSURE STATEMENT** ...................................................................... **C-1**

**STATEMENT REGARDING ORAL ARGUMENT** ...................................... **C-2**

**TABLE OF CONTENTS** ................................................................................... **I**

**TABLE OF AUTHORITIES** .........................................................................**III**

**STATEMENT OF JURISDICTION** .............................................................. **VI**

**STATEMENT OF THE ISSUES** ........................................................................**1**

**STATEMENT OF THE CASE** ............................................................................**3**

COURSE OF PROCEEDINGS AND DISPOSITION BELOW ..............................................3

STATEMENT OF FACTS .................................................................................5

    *A.    The History of Unrest in Grady's Mother/Baby Unit and Johnson's Overt Discriminatory Animus.* ...........................................................5

    *B.    Banks's HR Complaints and the Resulting Incomplete Investigation.* ......8

    *C.    Grady Promotes Johnson While the Investigation is Ongoing and Hires Nicole Lescota, Who is Debriefed on National Origin Tensions in the Unit and Banks's Complaints About Johnson.* ......................................................10

    *D.    Johnson Forces Banks to Resign, and Then Openly Celebrates.* ............13

    *E.    Grady Receives Another Complaint About Johnson* ...............................16

    *F.    Alleged Blood Pressure Issues; Johnson Investigates and Terminates Sanusi* ...................................................................................................16

STANDARD OF REVIEW ..............................................................................21

**SUMMARY OF ARGUMENT** .........................................................................**22**

**ARGUMENT AND CITATION OF AUTHORITIES** .......................................**26**

*A.    The Evidence Does Not Permit Summary Judgment on Grady's Alleged Honest Belief on Banks's Claims.*....................................................29

*B.    The Evidence Does Not Permit Summary Judgment on Sanusi's Claims.*...........................................................................................34

*C.    A Jury Should Decide Whether Banks Was Constructively Discharged.* 41

**CONCLUSION**.........................................................................................**44**

**CERTIFICATE OF COMPLIANCE WITH TYPE-VOLUME LIMIT** .........**46**

**CERTIFICATE OF SERVICE** ........................................................................**47**

## <u>TABLE OF AUTHORITIES</u>

**Cases**

*Acrey v. Am. Sheep Indus. Ass'n*, 981 F.2d 1569 (10th Cir. 1992) ........................43

*Anderson v. Liberty Lobby*, 477 U.S. 242 (1986) ............................................. 21, 30

*Boandl v. Geithner*, 752 F. Supp. 2d 540 (E.D. Pa. 2010) ......................................42

*Bryant v. Jones*, 575 F.3d 1281 (11th Cir. 2009 .....................................................43

*Calvert v. Doe*, 648 F. App'x 925 (11th Cir. 2016)..................................................27

*Casagrande v. OhioHealth Corp.*, 666 F. App'x 491 (6th Cir. 2016) ............. 35, 36

*Castro v. DeVry Univ., Inc.*, 786 F.3d 559 (7th Cir. 2015) .....................................32

*Celotex Corp. v. Catrett*, 477 U.S. 317, 322-23 (1986)...........................................21

*Cleveland v. Home Shopping Network, Inc.*, 369 F.3d 1189 (11th Cir. 2004).........41

*Dixon v. The Hallmark Cos., Inc.*, 627 F.3d 849 (11th Cir. 2010) ...........................1

*E.E.O.C. v. Univ. of Chicago Hosps.*, 276 F.3d 326 (7th Cir. 2002) ......................43

*Higdon v. Jackson*, 393 F.3d 1211 (11th Cir. 2004)................................................27

*Hutcherson v. Progressive Corp.*, 984 F.2d 1152 (11th Cir. 1993) ........................22

*Jones v. Dillard's, Inc.*, 331 F.3d 1259 (11th Cir. 2003)........................................21

*Kilgore v. Trussville Development, LLC*, 646 F. App'x 765 (11th Cir. 2016)........30

*Lee v. Cleveland Clinic Foundation*, 676 F. App'x 488, (6th Cir. 2017)...............31

*Lewis v. City of Union City, Georgia*, 934 F.3d 1169 (11th Cir. 2019) .................39

*Nat. R.R. Passenger Corp. v. Morgan*, 536 U.S. 101 (2002). ................................44

iii

*Nguyen v. Gambro BCT, Inc.*, 242 F. App'x 483 (10th Cir. 2007) .................. 32, 33

*Orr v. City of Albuquerque*, 531 F.3d 1210 (10th Cir. 2008) ...................................31

*Penn. State Police v. Suders*, 542 U.S. 129 (2004). .................................................42

*Reeves v. Sanderson Plumbing Prods. Inc.*, 530 U.S. 133, 151 (2000) ........... 21, 22

*Sandowski v. McAleenan*, 423 F. Supp. 3d 959 (D. Hawai'i 2019) .......................33

*Smith v. Lockheed-Martin Corp.*, 644 F.3d 1321 (11th Cir. 2011) .........................22

*Sorensen v. National R.R. Passenger Corp.*, 786 F. App'x 652 (9th Cir. 2019).....32

*Stephens v. DeGiovanni*, 852 F.3d 1298 (11th Cir. 2017)..........................................1

*Stremple v. Nicholson*, 289 F. App'x 571 (3d. Cir. 2008 ........................................42

*Strickland v. Norfolk S. Ry. Co.*, 692 F.3d 1151 (11th Cir. 2012)...........................22

*\*Tynes v. Florida Department of Juvenile Justice*, 88 F.4th 939 (11th Cir. 2023)22, 34, 36, 39

*Valderrama v. Rousseau*, 780 F.3d 1108 (11th Cir. 2015).........................................1

*Vessels v. Atlanta Indep. Sch. Sys.*, 408 F.3d 763 (11th Cir. 2005)........................32

*Washington v. Ill. Dep't of Revenue*, 420 F.3d 658 (7th Cir. 2005) .......................43

**Statutes**

28 U.S.C. § 1291 ........................................................................................................v

42 U.S.C. §§ 2000e *et seq.* .........................................................................................3

## Other Authorities

Eric Schnapper, *Honest Belief and Proof of Unlawful Motive*, Volume 71, *Buffalo Law Review*, 71 Buff. L. Rev. 769 (2023)...........................................................31

## Rules

Fed. R. Civ. P.56(c)...................................................................................................21

## STATEMENT OF JURISDICTION

This Court has jurisdiction of this matter under 28 U.S.C. § 1291 because this is an appeal of a final decision of the United States District Court for the Northern District of Georgia.

## <u>STATEMENT OF THE ISSUES</u>

I.      Whether, at the summary judgment stage, the District Court erred by construing facts in favor of the movant, crediting the movant's witnesses' testimony when a material conflict existed, and ignoring material facts and evidence in favor of the non-movants, contrary to, *inter alia*, *Stephens v. DeGiovanni*, 852 F.3d 1298, 1313-14 (11th Cir. 2017); *Dixon v. The Hallmark Cos., Inc.*, 627 F.3d 849, 854 (11th Cir. 2010); *Valderrama v. Rousseau*, 780 F.3d 1108, 1120 n.14 (11th Cir. 2015).

II.      Whether the District Court erred in concluding that Plaintiffs failed to rebut Appellee/Defendant's articulated reason for the adverse employment action as to Appellant/Plaintiff Banks given (a) the record evidence permitting the jury to conclude that the articulated reason was not honest or sincere; and (b) the totality of the record evidence of retaliatory intent.

III.      Whether the District Court erred in concluding that Plaintiffs failed to rebut Appellee/Defendant's articulated reason for the adverse employment action as to Appellant/Plaintiff Sanusi given (a) the record evidence permitting the jury to conclude that the articulated reason was not honest or sincere; and (b) the totality of the record evidence of discriminatory and retaliatory intent.

1

IV.       Whether the Eleventh Circuit should clarify the proper district court analysis regarding the honesty or sincerity of the decisionmaker's articulated grounds for a challenged employment action.

V.        Whether the District Court misapplied current precedent to erroneously conclude that Plaintiffs did not present sufficient evidence in total from which a jury could conclude that Appellee/Defendant retaliated against Appellant/Plaintiff Banks for engaging in protected activity.

VI.       Whether the District Court misapplied current precedent to erroneously conclude that Plaintiffs did not present sufficient evidence in total from which a jury could conclude that Appellee/Defendant retaliated against Appellant/Plaintiff Sanusi for engaging in protected activity.

VII.      Whether the District Court misapplied current precedent regarding "convincing mosaic" to erroneously conclude that Plaintiffs did not present sufficient evidence in total from which a jury could conclude that Appellee/Defendant discriminated against Appellant/Plaintiff Sanusi on the basis of her national origin.

VIII.     Whether the District Court misapplied current precedent to erroneously conclude that Plaintiffs did not present sufficient evidence from which a jury could conclude that Appellant/Plaintiff Banks was constructively discharged.

2

## STATEMENT OF THE CASE

### Course of Proceedings and Disposition Below

The Defendant-Appellee Grady Memorial Hospital Corporation ("Grady") allowed Tabitha Johnson, the Director of its Mother/Baby Unit (the "Unit"), to expressly discriminate against African employees. Among other things, Ms. Johnson created a pie chart regarding the national origins/ethnicities of the employees in the Unit for the stated purpose of reducing the percentage of African employees, and made a number of statements about her desire to effectuate that reduction. In May 2020, Johnson and her supervisor disciplined Plaintiff-Appellant Samantha Banks because she opposed this discriminatory practice, issuing her an unwarranted Final Warning that immediately made her ineligible for transfer and promotion. When administering the Final Warning, Johnson expressly referenced Banks's complaint to human resources about her (Johnson). Banks resigned. A few months later, Johnson terminated Plaintiff-Appellant Sanusi, an African member of the Unit who had also complained about Johnson's discriminatory treatment of Africans.

On February 22, 2021, Plaintiffs filed their Complaint in this action under Title VII of the Civil Rights Act of 1964, as amended, 42 U.S.C. §§ 2000e *et seq.* ("Title VII") [Doc. 1]. Relevant here, Plaintiff Sanusi asserted claims for discriminatory termination (Count II) and retaliatory termination (Count III), and

3

Plaintiff Banks asserted claims for retaliation (Count IV), and retaliatory constructive discharge (Count V).[1]

Following a lengthy discovery period, Grady moved for summary judgment on all claims. The Magistrate Judge recommended that Grady's motion be granted in a Report & Recommendation ("R&R") [Doc. 121] that, among other things, consistently construed facts and drew inferences in Grady's favor, including adopting Grady's position that, in stating that she wanted to reduce the percentage of Africans in the Unit, Johnson merely "touted diversity." [Doc. 121, p. 42]. The Magistrate Judge downplayed declarations from third party witnesses to Johnson's discriminatory statements and conduct, in part on the grounds that some of the witnesses were not themselves African. [Doc. 121, p. 43, n. 10]. The Magistrate Judge further concluded that both Banks and Sanusi failed to rebut Grady's articulated reason for the respective adverse employment actions based on a misapplication of the "honest belief" doctrine. [Doc. 121, p. 29-34, 39-49].

Banks and Sanusi timely objected. [Doc. 128]. On September 12, 2023, the District Court adopted the R&R in an opinion that: (i) block-quoted pages of the R&R's slanted recitation of facts; (ii) brushed aside, minimized, and/or misportrayed Plaintiff's evidence; (iii) and equally adopted the incorrect

---

[1] Plaintiff Sanusi abandoned Count I (Discriminatory Denial of Promotion).

4

application of the "honest belief" doctrine. [Doc. 135]. The District Court refused to consider the 14-page reply brief submitted by Banks and Sanusi in support of their objections. [Doc. 135 at p. 14, n. 1]. Plaintiffs filed a timely Notice of Appeal and seek reversal of the lower court's rulings. [Doc. 138].

<u>**Statement of Facts**</u>

### A.    The History of Unrest in Grady's Mother/Baby Unit and Johnson's Overt Discriminatory Animus.

Sanusi is originally from Sierra Leone and has lived and worked in the United States for over 30 years. [Doc. 106-3, p. 17]. After an earlier stint of employment, Sanusi became re-employed with Grady in February 2017. [Doc. 106-23, p. 1, ¶ 2]. During her employment, Sanusi received ten nominations for the Daisy Award, Defendant's highest nursing award. [*Id.*, p. 2, ¶ 3]. In March 2019, Banks started working for Grady as a Nurse in the Unit. [Doc. 106-22, p. 1, ¶ 2].

During the relevant time period, the Unit's nursing staff was effectively divided into two factions—American versus African and other non-American foreign nurses—and the American nurses, who were led by Johnson, largely avoided interacting with the African and foreign-born nurses, who they often derided. [Doc. 106-3, p. 57-59; Doc. 106-22, p. 3, ¶¶ 9-10; Doc. 106-24, p. 2, ¶¶ 4-5; Doc. 106-25, p. 2, ¶¶ 3-4; Doc. 106-26, p. 2, ¶ 3; Doc. 106-23, p. 2, ¶¶ 4-5].

In April 2019, then-Clinical Staff Manager ("CSM") Johnson told Banks that the African nurses tended to be "rough, especially those Nigerians," which Banks reported to then-Director Evelyn Laka. [Doc. 106-1, p. 96-98; Doc. 106-22, p. 2, ¶ 7]. In June 2019, Johnson told Banks that she would not hire any more African nurses and would reject resumes with "African-sounding names." [Doc. 106-1, p. 100]. In July 2019, Johnson created a pie chart representing the different national origins and/or ethnicities of the Unit. [Doc. 106-5, p. 70-71; Doc. 106-6, p. 7].

With some adjustment for legibility, the pie chart looked like this:



[*Id.*, Exh. 3 (spelling of "Haitian" corrected)].

When Johnson presented the pie chart, she said that there were too many Africans on the Unit, and it was time to dilute some of the Nigerians out. [Doc. 106-1, p. 102-103; Doc. 106-24, p. 2-3, ¶ 7].  Johnson shared the pie chart with Clinical Nurse Educator Carlotta Gabriele, Laka, and Banks, and said that she would be meeting with HR to discuss it.  [Doc. 106-1, p. 104; Doc. 106-5, p. 80-81].  Banks responded that she was 99% African and then complained to Laka about Johnson's discrimination, after which the relationship between Banks and Johnson deteriorated drastically.  [Doc. 106-1, p. 104, 106-108].[2]

In approximately August 2019, Laka informed Johnson that she and newly-hired CSM Oluseyi Abatan would share an office, after which Johnson told Banks that she "refuse[d] to share an office with that loud, obnoxious Nigerian," or words to that effect.  [*Id.*, p. 113; Doc. 106-22, p. 3, ¶ 11].

In September 2019, Banks was promoted to CSM. [Doc. 106-22, p. 3-4, ¶ 13].  In November 2019, Banks repeatedly expressed her concerns about Johnson's increasingly antagonistic behavior to Linda Wildey, the interim VP of Women's Services, and specifically said that she believed that Johnson's hostility

_____

[2] Banks and Gabriele asked Laka, who is African, why she allowed Johnson to discriminate against Africans, and Laka acknowledged that Johnson treated her badly and said that she would speak with her. [Doc. 106-22, p. 2, ¶ 7].

towards her was motivated by Banks's reports to Laka of Johnson's discrimination against Africans and Nigerians. [Doc. 106-1, p. 116, 119-121]. Wildey responded that Johnson and Banks needed to learn to get along. [*Id.*, p. 121-122].

However, Johnson made "getting along" impossible and ensured that the work environment was hostile for Banks. Banks and Abatan were regularly unfairly singled out by leadership for questioning regarding their competency; this included Johnson, and the American staff members who were close to Johnson, bullying, harassing, and using vile and condescending language towards Banks. [*Id.*, p. 114-115, 136; Doc. 106-22, p. 3-4, ¶¶ 13-15].

In November 2019, and as a result of Johnson's sustained hostility towards her, Banks sought medical treatment and was prescribed antidepressants for her overwhelming stress and anxiety, and also sought counseling through Grady's Employee Assistance Program. [Doc. 106-1, p. 151-153, 155].

## B.    Banks's HR Complaints and the Resulting Incomplete Investigation.

On November 27, 2019, Banks emailed HR Director Thomas Earnest about Johnson's behavior, stating, *inter alia*, that she had previously informed Wildey of Johnson's bullying, incivility, and defamatory statements. [*Id.*, p. 122-124; Doc. 106-2, p. 26-28].

On December 2, 2019, a Unit meeting began with a discussion of Banks's working relationship with Johnson, even though this was not on the agenda, and

Denise Mayhan, Grady's Project Manager for the "Talk With Me Baby" program, stated that the Unit's leadership would be required to let go of one or more Unit managers who could not "get over the hurt" and learn to work together. [Doc. 106-1, p. 168-172; Doc. 106-14, p. 129-132; Doc. 106-15, p. 6 (audio recording); Doc. 107; Doc. 106-16, p. 43; Doc. 106-17, p. 12-13].

Following the December 2, 2019 meeting, Banks again emailed Earnest, this time copying John Haupert, Grady's CEO, and Jacqueline Herd, Grady's Chief Nursing Officer, detailing, *inter alia*, what transpired during the meeting, that Wildey had been unresponsive to her attempts to address unprofessional conduct in the Unit, and that Johnson, with whom she still shared an office, continued to be hostile towards her. [Doc. 106-16, p. 27, 43; Doc. 106-17, p. 12-13].

In response to Banks's complaint, Earnest arranged interviews with various people, including Banks and Johnson. [Doc. 106-16, p. 54, 73-76; Doc. 106-17, p. 32-34]. Banks met with Earnest on or about December 11, 2019, and she complained about, *inter alia*, Johnson's statements that there were too many Africans and that, if Laka hired another with whom Johnson had to share an office, Johnson would leave. [*Id.*]. In deposition, Earnest could not identify any documents indicating that he had asked any other individuals about discrimination, and did not have any independent, specific recollection of having posed any questions to anyone concerning Banks's discrimination allegations. [Doc. 106-16,

p. 73-74, 84-86; Doc. 106-18, p. 39-41]. Earnest failed to complete a final report and did not officially conclude the investigation. [Doc. 106-16, p. 75-77, 84-85].

Johnson took Banks's December 2019 HR complaint against her "personally," and, as a result of Banks's complaints, Johnson felt that Banks was against her, and that "it was—a—a—an attack against [her]." [Doc. 106-7, p. 44-45, 70-71].

### C. Grady Promotes Johnson While the Investigation is Ongoing and Hires Nicole Lescota, Who is Debriefed on National Origin Tensions in the Unit and Banks's Complaints About Johnson.

On December 18, 2019, with the investigation ongoing, Wildey promoted Johnson to interim Unit Director. [Doc. 106-5, p. 158, 173]. In January 2020, Nicole Lescota replaced Wildey, during which transition Wildey told Lescota to "keep [her] eye out for [those people on the Unit] that caused drama and trouble on the unit," which expressly included Banks. [Doc. 106-9, p. 15, 93]. Herd told Lescota that Laka had tended to hire people from Laka's own country, which may have caused problems because people were feeling left out. [*Id.*, p. 95-96]. Herd also told Lescota about the investigation into Johnson, and Lescota spoke with Johnson and Human Resources Manager Deonte Fuller about Banks's complaints regarding Johnson and the pie chart. [*Id.*, p. 29-34, 37-40].

In February 2020, Johnson interviewed to become the Unit's permanent Director, including a panel interview with Unit staff that included Banks, Amy

Sanusi, Abatan, and Kelly Lee.  [Doc. 106-27, p. 10-12; Doc. 106-9, p. 29; Doc. 106-3, p. 100-101].  In response to a question from Abatan about the division between Americans and Africans and issues of race, Johnson said that she had requested that HR "send me diversity because I need diversity"; and that "you can't have too much of the same," which "too much of the same" statement encompassed national origin and race, a problem from which she believed the Unit suffered.  [Doc. 106-5, p. 176-180].

After Johnson's interview, the interview panelists met with Lescota without Johnson present, and Banks raised concerns about Johnson's behavior towards Abatan, who Johnson had singled out and repeatedly referred to as being "a loud, obnoxious African" with whom Johnson had stated she did not want to share an office, as well as concerns about Johnson's issue with African nurses.  [Doc. 106-1, p. 136; *see also* Doc. 106-3, p. 113-114, 116-118].  According to Lescota, the majority of the "tail end" of the Johnson interview debrief became about national origin or race.  [Doc. 106-9, p. 47-50].  Sanusi raised concerns regarding Johnson's treatment of African employees during and following Johnson's February 2020 interview.  [Doc. 106-1, p. 136; *see also* Doc. 106-3, p. 113-114, 116-118; Doc. 106-23, p. 3-4, ¶¶ 8-13].

Lescota then met with Johnson and discussed the concerns that had been raised; Johnson told Lescota that Lescota would have "to figure out what is true" in

making the hiring decision, which was a reference to the HR complaints that had

been made about Johnson, including Banks's complaint.  [Doc. 106-5, p. 181-183].

> On March 9, 2020, Johnson and Naphia Bennett texted as follows:

> **Johnson**: I spoke with Deonte.. I felt better afterwards
> **Bennett**: Good! Let's make this ish happen!!
> **Johnson**: I'm still praying Naphia!! We shall see. Deonte put that thing in perspective.. he was like decide if that money and title is worth it!
> **Bennett**: Well, nothing good comes easy. And we have our work cut out. I know you will do great, <u>hopefully those who don't want to be on your team will leave… but Sam is staying with you!!</u>
> **Johnson**: <u>I talked to him about that too!!! I know you won't take her, it wouldn't make sense for you to.</u> Maybe as a staff RN, but she is not experienced enough to lead anyone honestly, let alone LD
> **Bennett**: I know he was like oh lawd!!
> **Johnson**: Well, he clearly sees what Sam is about
> …
> **Johnson**: Your mom is right!! That get you absolutely no where! <u>Nicole suggested having the managers reapply for their position!! I am on board with that 100%</u>
> …

[Doc. 106-7, p. 52-58; Doc. 106-8, p. 105-106 (emphasis added; obscene statement

omitted)].

Notwithstanding the complaints about Johnson's discrimination, Lescota

offered her the Director position, and Johnson accepted, giving her the authority to

interview and hire without Lescota's approval, as well as terminate in consultation

with Lescota.  [Doc. 106-9, p. 15, 22-24].  Perhaps explaining this decision,

Lescota testified that: she did <u>not</u> understand how the pie chart could be perceived

as discriminatory; and it would <u>not</u> be discriminatory for Johnson to come into

Lescota's office and state that there were too many Africans in the Unit, and that Johnson would leave if one more was hired with whom she would have to share an office.  [*Id.*, p. 53, 58-60].

In March 2020, Johnson emailed Lescota a summary of perceived issues within the Unit and proposed solutions, and wrote that she had "begun to hire staff from different ethnic groups as well as generations in [an] effort to make the staff more diverse. I will encourage my CSMs to do the same and respect each staff member and their differences."  [Doc. 106-5, p. 232; Doc. 106-6, p. 50, 52].

In April 2020, Johnson removed Sanusi as a Charge Nurse and replaced her with Brenda Williams, an American nurse.  [Doc. 106-3, p. 162-164; Doc. 106-23, p. 4-5, ¶ 14].  Before this happened, Catherine Corley, Johnson's friend and close work associate, stated that she did not want to work as charge nurse on the Unit until certain African nurses left or were fired.  [Doc. 106-3, p. 162-164].

**D.    Johnson Forces Banks to Resign, and Then Openly Celebrates.**

On April 30, 2020, Banks met with Johnson and Lescota about an incident the previous day with another Unit nurse, Chinenye Ndukwe, as well as other

alleged complaints.  [Doc. 106-1, p. 15-16, 18-19].[3]  Banks's testimony is that, in the meeting, Banks was directed not to talk to Daniella Lewis, but was <u>not</u> instructed to forego contact with other individuals.  [*Id.*, p. 24-25].  After the April 30, 2020 meeting, Banks contacted Unit members Anita Brownell and Ndukwe.  [*Id.*, p. 27].  Later that day, Johnson emailed Lescota, copying Fuller, alleging that Banks contacting Ndukwe and Brownell was insubordinate.  [Doc. 106-9, p. 129-130; Doc. 106-11, p. 289].  Lescota, Johnson, Fuller, and Earnest decided to issue Banks a Final Written Warning, which Johnson helped draft.  [Doc. 106-9, p. 138-139; Doc. 106-11, p. 290-292; Doc. 106-27, p. 16; Doc. 106-5, p. 214-217; Doc. 106-6, p. 44-46].

On May 6, 2020, Lescota and Johnson met with Banks to issue her the Final Written Warning, and Johnson expressly referenced Banks's HR complaint immediately before Banks was presented with the document, stating she (Johnson) had to "bite her tongue" to prevent herself from confronting Banks earlier.  [Doc. 106-5, p. 224, 232; Doc. 106-6, p. 47-48, 49 (audio recording); Doc. 106-9, p. 143; Doc. 107 (audio recording); Doc. 120-1 (transcript of audio recording); Doc. 106-1, p. 208-209].

_____

[3] Lescota testified that the meeting was non-disciplinary, whereas Johnson testified that its purpose was to administer discipline. [Doc. 106-9, p. 110; Doc. 106-5, p. 201-203, 205].

14

The Final Written Warning states, *inter alia*, that it will be placed in Banks's file, failure to meet expectations will result in further disciplinary action up to and including termination, and it will remain active for 12 months.  [Doc. 106-6, p. 47-48].  Thus, Banks could not be promoted or transferred for that 12-month period.  [Doc. 106-20, p. 52-58; Doc. 102-21, p. 22, 32].  Banks was told that she would be terminated if she left the room without signing the Final Written Warning, but Banks refused to sign the document because (i) she disagreed with it, (ii) it was clearly retaliatory, and (iii) agreeing to such discipline would, *inter alia*: prevent Banks from receiving a transfer or promotion within Grady for up to 12 months, as well substantially harm Banks's job prospects outside of Grady given the strong stigma associated with such discipline.  [Doc. 106-22, p. 6, ¶ 22].  Accordingly, Banks resigned.  [*Id.*].

After Banks resigned, Johnson engaged in the following text exchange:

**Johnson**: Well Linda, it happened!!!! Kiwana resigned, Seyi resigned and Samantha abruptly resigned today!! Nicole is taking care of business!!!!
**Bennett**: Yes!! She rid the house of those scumbags!!
**Wildey**: We knew she had grit. Now build your team!
**Johnson**: Hell yeah! (stated in a picture of a person pumping their fist into the air)
**Bennett**: (image of a man wearing a shirt that said "Yes! Yes! Yes!")

[Doc. 106-7, p. 46-51; Doc. 106-8, p. 100-101].

### E.    Grady Receives Another Complaint About Johnson

On August 10, 2020, Janet Ricketts, a non-American Unit nurse, emailed Grady's CEO, John Haupert, copying Earnest and Dr. Herd: complaining about unwarranted discipline she had received from Johnson, which meant that another written discipline could result in Ricketts's termination, tarnishing her professional reputation; stating that Johnson was biased and discriminated "against certain of us, otherwise known as 'Foreigners'"; and stating that she would be tendering her resignation.  [Doc. 106-18, p. 95; Doc. 106-19, p. 46-47].

### F.    Alleged Blood Pressure Issues; Johnson Investigates and Terminates Sanusi

On September 17, 2020, there was an incident on the Unit in which two patients allegedly did not have their blood pressures taken.  [Doc. 106-3, p. 229; Doc. 106-5, p. 258-260].  These patients were not assigned to Sanusi but were instead assigned to a newly hired but experienced nurse, which assignment Sanusi explained to Johnson when questioned later about the incident.  [Doc. 106-3, p. 229; Doc. 106-5, p. 258-260].

On Friday, October 2, 2020, a blood pressure machine being used for one of Sanusi's patients malfunctioned, causing it to incorrectly display a time that was four hours delayed, which then caused the patient's doctor to incorrectly allege in an incident report that Sanusi did not timely inform the doctor about the patient's

16

blood pressure and allege that Sanusi lied about it. [Doc. 106-5, p. 268-270; Doc. 106-6, p. 57-58; Doc. 106-3, p. 230-236].

In actuality, on October 2, 2020, in accordance with Grady's protocol concerning patients with elevated blood pressure, Sanusi went to the patient's room after a technician recorded an out-of-range blood pressure for the patient, so that Sanusi could take a second blood pressure reading, which she then promptly took. [Doc. 106-3, p. 230-232; Doc. 106-23, p. 5-6, ¶¶ 17-18; Doc. 106-9, p. 235]. The patient's second blood pressure reading was still out-of-range, so Sanusi left the room to report the situation to the patient's doctor, in accordance with protocol, at which time Sanusi was called away briefly to another patient's room across the hall before she was able to call the doctor. [Doc. 106-3, p. 230-232; Doc. 106-23, p. 5-6, ¶ 18]. Grady's policy does <u>not</u> have any specific requirement regarding the timeframe in which a nurse has to report a high blood pressure. [*See* Doc. 101-18, p. 3-5].

Sanusi was in the other patient room for no more than five minutes attending to the other patient before she was called by the clerk and informed that the doctor was in the room with the patient with the high blood pressure, at which time Sanusi returned and explained that she was about to call the doctor to report the situation but had been called away to attend to another patient. [Doc. 106-3, p. 230-232; Doc. 106-23, p. 5-6, ¶ 18]. The doctor mistakenly referenced the time on the blood

pressure machine and erroneously concluded that the patient's blood pressure had been high all night without being reported, and that Sanusi was lying about it. [Doc. 106-3, p. 230-237; Doc. 106-23, p. 6, ¶ 19].

The October 2, 2020 incident was reported to Johnson, with whom Sanusi met that same day along with Bennett, during which meeting Sanusi explained what had actually happened, and Johnson directed Sanusi to draft a written statement regarding that incident. [Doc. 106-3, p. 230-237; Doc. 106-23, p. 6, ¶ 20]. The October 2, 2020 meeting between Johnson, Bennett, and Sanusi concluded in a "professional manner," Sanusi conducted herself in a "professional manner," and Sanusi left when the meeting was over and was in no way insubordinate. [Doc. 106-23, p. 6, ¶ 20; Doc. 106-5, p. 277, 283].[4]

After the October 2, 2020 meeting, Johnson sent an email to Lescota at 8:42 a.m., copying Fuller and Bennett, in which Johnson described Sanusi's purported failure to take the patient's blood pressure, stated that Sanusi began crying and left the meeting while Johnson was speaking, and indicated that Johnson would begin an investigation in conjunction with "Risk." [Doc. 106-9, p. 206-207; Doc. 106-11, p. 312-13]. At 8:48 a.m. on October 2, 2020, Lescota

---

[4] Johnson later attempted to change this testimony after speaking with her counsel during a break. [*See* Doc. 106-5, p. 288-291].

responded to Johnson's email, again copying Fuller and Bennett, stating to Johnson that Sanusi was "being insubordinate" by walking out of the meeting, recommending a final written warning and/or termination, and asking Johnson to draft a timeline of events that had occurred recently with respect to Sanusi. [Doc. 106-9, p. 206-208; Doc. 106-11, p. 312-313].

At 9:23 a.m. on October 2, 2020, Fuller responded to Lescota, copying Johnson and Bennett, attaching a draft "final warning/term document" for Johnson to complete and stating that: he agreed with Lescota; Sanusi would be given the weekend to provide her statement; and Sanusi could be terminated on Monday "if we are in agreement. . . ." [*Id.*].

That same day, October 2, 2020, Unit nurse Mary Campbell texted Johnson, stating that Sanusi had showed her (Campbell) that the blood pressure machine was four hours behind, and Johnson personally looked at the blood pressure machine and verified that the time was in fact off, as Sanusi had stated. [Doc. 106-7, p. 37-41; Doc. 106-8, p. 87-88]. In other words, as of October 2, 2020, Johnson knew that Sanusi was telling the truth about the machine, which meant that she had not been "lying" to the doctor, and that she had not waited too long to call the doctor.

No one other than Johnson conducted any form of investigation into the October 2, 2020 incident, and Lescota relied entirely on Johnson. [Doc. 106-5, p.

19

271-273; Doc. 106-9, p. 200-202, 219 (Lescota did not personally investigate the September 17 or October 2 incidents, and, to her knowledge, the only "investigation" between October 2 and October 6, 2020, was "a review of the paperwork."); Doc. 106-23, p. 7, ¶ 23; Doc. 106-18, p. 140-141 (Fuller did not perform an independent investigation of the October 2 incident but instead deferred to the Unit's internal investigation)].

On Monday, October 5, 2020, Johnson called Sanusi and informed her that the investigation into the blood pressure incident had been completed, even though Sanusi had not yet submitted the statement that she had drafted over the weekend at Johnson's direction. [Doc. 106-3, p. 230-237; Doc. 106-23, p. 6, ¶ 21; Doc. 106-5, p. 277-278, Doc. 106-6, p. 61-63]. On October 6, 2020, Johnson and Bennett met with Sanusi and terminated her,[5] and Johnson presented Sanusi with

---

[5] Grady's explanation regarding who made the termination decision is muddled. Although Johnson testified that she made the decision to terminate Sanusi [Doc. 106-5, p. 273-274], Grady's Interrogatory responses state that Lescota, Johnson, and Fuller each participated in the decision-making process. [Doc. 106-27, p. 15]. Johnson stated in text messages to her brother on October 6, 2020, that "my boss told me it's time. Told me I had to do it." [Doc. 106-7, p. 18-20; Doc. 106-8, p. 74]. Lescota, who relied entirely on Johnson to investigate, testified that she could not specify the precise bases for Sanusi's termination, which may have included things not included in Sanusi's termination paperwork that Lescota had no role in drafting. [Doc. 106-9, p. 221-225]. Fuller testified that he would have been fine not terminating Sanusi if that was what Lescota and Johnson decided. [Doc. 106-18, p. 136].

the termination paperwork that Johnson had begun preparing on October 2, 2020, which paperwork purported to describe the events leading to the termination as the September 17 and October 2 incidents, as well as the allegation that Sanusi abruptly left the room on October 2, 2020. [Doc. 106-5, p. 275-276; Doc. 106-6, p. 61-63; Doc. 106-23, p. 7, ¶ 22; Doc. 106-9, p. 229-230; Doc. 106-11, p. 317-318].

## **Standard of Review**

This Court reviews a summary judgment decision *de novo*. *Jones v. Dillard's, Inc.*, 331 F.3d 1259, 1262 (11th Cir. 2003). Summary judgment is appropriate only when no genuine issue of material fact exists and the defendant, as a moving party, is entitled to judgment as a matter of law. Fed. R. Civ. P.56(c); *Celotex Corp. v. Catrett*, 477 U.S. 317, 322-23 (1986). Though the Court should review the record as a whole, "it must disregard all evidence favorable to the moving party that the jury is not required to believe." *Reeves v. Sanderson Plumbing Prods. Inc.*, 530 U.S. 133, 151 (2000). At the summary judgment stage, "the judge's function is not . . . to weigh the evidence and determine the truth of the matter but to determine whether there is a genuine issue for trial." *Anderson v. Liberty Lobby*, 477 U.S. 242, 249 (1986). The inquiry is "whether the evidence presents a sufficient disagreement to require submission to a jury or whether it is so one-sided that one party must prevail as a matter of law." *Id.* at 251. Summary judgment is improper if there is any genuine issue of material fact, even if it is

created by the testimony of a party.  *See, e.g.*, *Strickland v. Norfolk S. Ry. Co.*, 692 F.3d 1151, 1160 (11th Cir. 2012).

"The court may not weigh evidence to resolve factual disputes – if a genuine issue of material fact is found, summary judgment <u>must</u> be denied."  *Hutcherson v. Progressive Corp.*, 984 F.2d 1152, 1155 (11th Cir. 1993) (emphasis added). Instead, the Court "must draw all reasonable inferences in favor of [Plaintiffs]." *Reeves*, 530 U.S. at 150.  The Court "should give credence to the evidence favoring [Plaintiffs]" and may only credit evidence supporting the Defendant "that is uncontradicted and unimpeached," and, even then, only "to the extent that that evidence comes from disinterested witnesses."  *Id.* at 151.  Ultimately, in employment discrimination cases, "the plaintiff will always survive summary judgment if [s]he presents circumstantial evidence that creates a triable issue concerning the employer's discriminatory intent."  *Smith v. Lockheed-Martin Corp.*, 644 F.3d 1321, 1328 (11th Cir. 2011).

## <u>SUMMARY OF ARGUMENT</u>

Courts must consider the totality of the evidence presented by the plaintiffs to determine whether a jury could conclude that discrimination or retaliation occurred.  *Tynes v. Florida Department of Juvenile Justice*, 88 F.4th 939 (11th Cir. 2023).  That is not what happened here.  The District Court misapplied the "honest belief" doctrine, refused to acknowledge that Plaintiffs rebutted Grady's contention

22

that it honestly believed the articulated reasons for the adverse actions, and failed to consider those reasons in the overall context of the evidence. The District Court's summary judgment analysis essentially grants immunity to defendants capable of articulating a justification for adverse actions and professing to believe that justification.

For both Banks and Sanusi, the District Court dismissed Plaintiffs' evidence contradicting Grady's articulated reason because – the Court expressed – it does not matter if Grady was right or wrong about the reason if Grady believed it at the time. The District Court got it wrong for two reasons. First, there is sufficient evidence for a jury to conclude that Grady did <u>not</u> honestly believe the purported justification. Second, the totality of the evidence would allow the trier of fact to conclude that discriminatory or retaliatory animus was the real reason for the adverse actions.

With respect to Banks, Grady claims that she was issued a Final Warning because Johnson and Lescota directed her not to contact two individuals and she contacted them anyway. But Banks testifies that Johnson and Lescota did <u>not</u> issue that directive. If the trier of fact believes Banks, Johnson and Lescota are not telling the truth, and thus could not have believed the articulated reason for termination. Given this contradictory testimony, it is Banks's version, not Grady's that must be believed. With Grady's explanation met head on and rebutted, it is

23

clear that a reasonable jury could find that Johnson was motivated by retaliatory animus given that, Johnson testified that she felt attacked by Banks's complaint, referenced Banks's complaint when administering the Final Warning, and then celebrated when Banks resigned.

Tellingly, the District Court states that it "remains unclear" whether Johnson knew about Banks's complaint when issuing the May 2020 Final Warning. [Doc. 135, p. 22, n. 3]. But it is not at all unclear. Johnson testified that she felt that Banks's complaint was an "attack" against her and expressly referenced Banks's complaint about her when administering the Final Warning in the May 2020 meeting. [Doc. 106-5, p. 224, 232; Doc. 106-6, p. 47-48, 49 (audio recording); Doc. 106-7, p. 44-45, 70-71; Doc. 106-9, p. 143; Doc. 107 (audio recording); Docs. 120, 120-1 (transcript of audio recording); Doc. 106-1, p. 208-209]. The Magistrate Judge, in the R&R adopted by the District Court, concluded that Johnson learned about Banks's protected activity in December 2019. [Doc. 121, p. 26]. The District Court's unfamiliarity with this critical fact is indicative of the level of attention paid to Banks's material evidence of retaliatory animus.

With respect to Sanusi, who is given cursory treatment in both the R&R and Order, Grady claims that Johnson terminated Sanusi because she did not timely take blood pressures with respect to patients and/or failed to timely report a patient's elevated blood pressure. However, Johnson knew contemporaneously

from her own investigation that the time on the blood pressure machine was incorrect – it was off by four hours and the doctor, not Sanusi, had made a mistake. Grady's reasons for Sanusi's termination have also shifted over time – initially, it was partly because of Sanusi's "insubordination" by allegedly walking out of a meeting with Johnson and Bennett. However, Johnson testified that did not happen. Sanusi's rebuttal of one alleged reason for termination and the disappearance of the other could lead a jury to conclude that Grady is not telling the truth.

More to the point, a reasonable jury could also conclude that a supervisor who said that she wanted to get rid of Africans on the Unit, wanted to reduce the percentage of Africans on the Unit, and would not hire applicants with African-sounding names, was motivated by discriminatory animus when she terminated an African nurse who had opposed that discrimination. The Magistrate Judge and District Court failed to credit the non-movants' evidence demonstrating this animus. Among other things, the Magistrate Judge ignored in third-party witness declarations: (i) Johnson's expressly discriminatory statements about Africans (only citing one such statement) [*compare* Doc. 121, p. 43 n. 10 *with* Gabriele Declaration, Doc. 106-24, p. 2-4, ¶¶ 6, 7, 9, 12, 14]; and (ii) Johnson's discrimination against another African employee, including discipline of that employee because she was speaking in her native language. [Doc. 106-25, p. 3-4,

¶¶ 8-9, 13-14].  Both the Magistrate Judge and District Court failed to note that Gabriele testified in her declaration that: "Ms. Johnson told me that there were too many Africans in the Unit and some of them needed to be gotten rid of."  [Doc. 106-24, p. 3, ¶ 9].

## ARGUMENT AND CITATION OF AUTHORITIES

Ultimately, the District Court granted summary judgment on both Plaintiffs' claims because it incorrectly concluded that they failed to rebut Grady's articulated reason for the adverse employment actions.  The Magistrate Judge and District Court correctly concluded that Banks engaged in protected activity under Title VII. [Doc. 121, p. 23-24; Doc. 135, p. 19].  The Magistrate Judge further concluded that Banks suffered an adverse action, and the District Court "assume[d] without deciding that two (2) adverse actions did occur."  [Doc. 121, p. 23-27; Doc. 135, p. 19-20].  Although the Magistrate Judge found no causation between Banks's protected activity and the adverse action (because of an incorrectly-applied temporal proximity bar) [Doc. 121, p. 28],[6] the District Court did not expressly rely

_____

[6] As explained fully in Plaintiffs' objections [Doc. 128, p. 10-13], the Magistrate Judge's causation analysis was fatally flawed insofar as it purported to apply a rule in which plaintiffs are categorically unable to show causation to meet the *prima facie* case if a certain amount of time had passed between the protected activity and the adverse action.  To demonstrate a *prima face* case of retaliation, Plaintiffs must show protected activity, an adverse action, and that the protected activity and

on this conclusion, "set[] aside" any issue regarding the Magistrate Judge's analysis of temporal proximity, and addressed pretext assuming the causation element was satisfied.    [Doc. 135, p. 20, 22].    With respect to Sanusi's discrimination claim, she is a member of a protected class (African) and suffered an adverse action (termination).  The District Court did not address the issue of whether Sanusi engaged in protected activity to support her retaliatory termination claim.[7]

In dismissing Plaintiffs' claims because it concluded they failed to rebut Grady's articulated reasons for termination, the District Court: (1) misapplied the honest belief doctrine such that Grady's witnesses' testimony was effectively deemed irrefutable, and (2) failed to consider the totality of the evidence regarding illegal animus.

---

adverse action are not completely unrelated. *Higdon v. Jackson*, 393 F.3d 1211, 1219-20 (11th Cir. 2004).  Temporal proximity is one way to demonstrate this causation; a short period of time between protected activity an adverse action can give rise to a presumption of causation, standing alone. *Id.* at 1220. It, however, is not required to show causation, and a presumption does not arise against causation if a few more months passed. Indeed, this Court has found causation established after years have elapsed. *See*, *e.g.*, *Calvert v. Doe*, 648 F. App'x 925 (11th Cir. 2016) (reversing summary judgment where retaliation occurred seven years after protected activity).

[7] Sanusi engaged in protected activity when she raised concerns regarding Johnson's treatment of African employees during and following Johnson's February 2020 interview.  [Doc. 106-1, p. 136; *see also* Doc. 106-3, p. 113-114, 116-118; Doc. 106-23, p. 3-4, ¶¶ 8-13].

As to Banks, the District Court states:

> Plaintiff Banks does not offer any evidence to suggest the existence of pretext beyond speculating that "[i]f Johnson and Lescota knew they had not given [the disputed] directive but were looking for a way to rid themselves of the oft-complaining [Plaintiff] Banks, they lacked a sincere, good-faith belief that she had violated a work rule." [Doc. 128 at 14].   This speculation is insufficient to demonstrate that Defendant's proffered reasoning for taking the adverse actions is pretextual. Regardless of who Plaintiff Banks was instructed to refrain from contacting after the April 30, 2020 meeting, evidence in the record supports that Lescota, as Vice President of Women's Services for Defendant, believed in good faith that Plaintiff Banks had been insubordinate by contacting several colleagues after that meeting.

[Doc. 135 at p. 24-25] (citation omitted).

As to Sanusi, the District Court similarly finds:

> Despite her conclusory assertion to the contrary, Plaintiff Sanusi does not offer evidence to rebut the above legitimate, nondiscriminatory reasons for her termination. [See Doc. 128 at 22, 26]. And, as the Court explained with regard to Plaintiff Banks' retaliation claim, whether Plaintiff Sanusi *actually* violated the protocols or performance 'expectations' at issue is not the determinative question; rather, the crux of the pretext inquiry is whether Defendant had an honest, good faith belief that such violations had occurred. … Even considering the declarations Plaintiff Sanusi claims the Magistrate Judge improperly discounted, the Court finds Defendant possessed a good faith belief in the nondiscriminatory reasons for its action and that Plaintiff Sanusi fails to present evidence to the contrary.

[Doc. 135 at p. 31] (emphasis in original) (citations omitted).

These findings are wrong because: (1) both Plaintiffs did effectively rebut Grady's reason, particularly when Plaintiffs' testimony (as opposed to Grady's) is credited and inferences are drawn in their favor; and (2) both Plaintiffs introduced sufficient evidence for a reasonable jury to conclude that the adverse employment action was caused by illicit animus.

### A.    The Evidence Does Not Permit Summary Judgment on Grady's Alleged Honest Belief on Banks's Claims.

Banks has squarely rebutted Grady's purported basis for the adverse action and there is a genuine issue of material fact as to the instruction given that she allegedly violated.  Banks, Johnson and Lescota provide different testimony about the directive Banks was given at the April 30, 2022 meeting, which they all attended.  Banks testified that she was instructed not to talk to Daniela Lewis, but was not instructed to forego contact with other individuals.  [Doc. 106-1, p. 24-25].  Johnson testified that Banks was instructed not to "talk to any of these employees" and "don't go back to" Ndukwe.  [Doc. 106-5, p. 221].  Lescota testified that Banks was instructed not to talk to any of the complainants.  [Doc. 106-9, p. 121-124].  There is accordingly a factual dispute about the instruction the decisionmakers gave to Banks, <u>the alleged violation of which Grady contends is the entire basis for the adverse action</u>.  If a jury believed Banks, it could disbelieve Johnson and Lescota.  At this stage, it is Banks, not Grady's witnesses, who must

be believed and all inferences are to be drawn in her favor. *Anderson*, 477 U.S. at 255 (1986).[8]

As stated expressly in Plaintiffs' objections, this is not a situation in which Johnson and Lescota were relying on good faith on what they learned from a third party and were truly "mistaken." If the Court credits Banks's testimony, as it must at this stage, Johnson and Lescota are not telling the truth and did not sincerely believe the grounds for the adverse action.  At summary judgment, the Court cannot credit Grady's witnesses' testimony over Plaintiffs' as to the same conversation and instruction and conclude that Grady has an irrebuttable good faith belief in its recitation of events:

> The honest belief doctrine usually concerns a decisionmaker who did *not* have personal knowledge of the fact at issue and, lacking such personal knowledge, arrived at a belief by drawing an inference from some other information the defendant did possess.  Thus courts have repeatedly recognized that the honest belief doctrine at least ordinarily does not apply if the trier of fact could conclude that the asserted factual basis of the defendant's explanation was within the personal knowledge of the decisionmaker.

---

[8] While Banks is certainly an interested witness, so are Johnson and Lescota. *See Kilgore v. Trussville Development, LLC*, 646 F. App'x 765, 775-76 (11th Cir. 2016) (reversing summary judgment due to questions about whether employer honestly believed justification for termination and recognizing that decisionmaker was "not a disinterested witness.").

Eric Schnapper, *Honest Belief and Proof of Unlawful Motive*, Volume 71, *Buffalo Law Review*, 71 Buff. L. Rev. 769, 784-85 (2023) (emphasis in original).

If a jury believed Banks and concluded that Lescota and Johnson did not give the challenged directive, it necessarily could conclude that they were not being honest about giving that directive, and instead, were lying.   In this circumstance, Rule 56 does not permit the Court to grant summary judgment.  *See Lee v. Cleveland Clinic Foundation*, 676 F. App'x 488, 499 n.3 (6th Cir. 2017) ("[I]t is disputed whether CCF held an honest belief that patients complained against Plaintiff and thus whether CCF held an honest belief is a factual question for the factfinder to decide that rests upon credibility determinations. Defendants may not simply assert the doctrine to disguise an improperly imposed disciplinary action if the decisionmakers could not have had that belief at the time of their decision.) (emphasis added); *Orr v. City of Albuquerque*, 531 F.3d 1210, 1218 (10th Cir. 2008) (Gorsuch, J.) (summary judgment reversed when reasonable jury could conclude that decisionmaker knew her actions where inconsistent with policy despite claimed honest, mistaken belief).

Banks is not, as claimed by the District Court, "speculating."  She was in the room.  Her testimony is based on her personal knowledge about what Johnson and Lescota did and did not say.  The material dispute regarding the directive given by the decisionmakers necessarily presents a jury question.  *See Vessels v. Atlanta*

31

*Indep. Sch. Sys.*, 408 F.3d 763, 771 (11th Cir. 2005) (holding that the plaintiff raised a genuine issue of fact as to the sincerity of the employer's alleged belief because plaintiff, through his personal knowledge, denied the occurrence of certain events as alleged by the employer that were based only on the employer's personal knowledge, and presented evidence that the employer's belief related to those events was unworthy of credence); *Sorensen v. National R.R. Passenger Corp.*, 786 F. App'x 652, 655 n.3 (9th Cir. 2019) ("Nor can Amtrak avail itself of the 'honest belief' doctrine. Crozier, the primary decisionmaker, would have known whether she authorized Sorensen to go over the thresholds or not."); *Castro v. DeVry Univ., Inc.*, 786 F.3d 559, 572 (7th Cir. 2015) ("If, as [Plaintiff] contends, [the decisionmakers] are lying about these events, then a reasonable trier of fact could find that [the decisionmakers] fabricated their reports to create a false reason for terminating him. Under these circumstances, summary judgment is not appropriate.").

In a similar case, *Nguyen v. Gambro BCT, Inc.*, 242 F. App'x 483 (10th Cir. 2007), the defendant claimed that it terminated the plaintiff because she failed to maintain the confidentiality of a meeting with her supervisors, and instead spoke about the meeting with co-workers on the production floor. *Nguyen*, 242 F. App'x at 485-86. Nguyen, however, testified that her supervisors sent her home directly following the meeting and, as such, she could not have had the production-floor

32

conversations. *Id.* The Tenth Circuit reversed summary judgment for the defendant, because "a jury that chooses to adopt Ngyuen's version of the facts could doubt whether Gonzales honestly believed a breach of confidentiality had taken place." *Id*. at 490. In another similar case, *Sandowski v. McAleenan*, 423 F. Supp. 3d 959, 976 (D. Hawai'i 2019), summary judgment was improper because there was contradictory testimony about an order given by the decisionmaker (and whether the plaintiff disobeyed it).

This all must of course also be put in context in order to determine whether a reasonable jury could conclude that the adverse action was caused by Grady's retaliatory animus for Banks's protected activity. The surrounding evidence of retaliatory animus is compelling. Johnson referenced Banks's protected activity when administering the adverse action. [Doc. 106-5, p. 224, 232; Doc. 106-6, p. 47-48, 49 (audio recording); Doc. 106-9, p. 143; Doc. 107 (audio recording); Doc. 120-1 (transcript of audio recording); Doc. 106-1, p. 208-209]. Accordingly, Johnson herself drew the connection between protected activity and adverse action. This facet of the case is not Banks's word against Johnson's. It is recorded. [*Id.*]. A jury will hear Johnson, in her own words, referencing Banks's discrimination complaint when handing Banks a career-altering Final Warning.

Johnson then unequivocally celebrated when Banks resigned. [Doc. 106-7, p. 46-51; Doc. 106-8, p. 100-101]. She had also, of course, much earlier freely

discussed how she did not want Banks to remain on her team.  [Doc. 106-7, p. 53-58; Doc. 106-8, p. 105-106].   There is simply no way that a Court faithfully applying Rule 56 can rule based on this evidence that a reasonable jury could not conclude Johnson was motivated by retaliation.

### B.     The Evidence Does Not Permit Summary Judgment on Sanusi's Claims.

Sanusi also put forth evidence that would allow a jury to conclude that Johnson did not have an honest belief that she violated a work rule before terminating her.  The Magistrate Judge and District Court's decisions on summary judgment as to Sanusi run afoul of this Court's proscription in *Tynes v. Florida Department of Juvenile Justice*, 88 F.4th 939 (11th Cir. 2023) – that is, an uber-technical application of *McDonnell Douglas* that deploys that judge-made procedural device to dismiss a case in which the evidence of discriminatory animus is resounding.  Johnson, the person who terminated Sanusi, repeatedly stated that there were too many Africans in the Unit and she wanted to get rid of them.  This point-blank confession of discriminatory animus by the decisionmaker is entirely absent from the District Court's analysis of whether Sanusi's discriminatory termination claim should be dismissed.  [Doc. 135, p. 29-32].

The District Court's error in the mechanistic misapplication of *McDonnell Douglas* is compounded by its misuse of the honest belief doctrine.  Grady (now) claims that Sanusi was terminated because she failed to timely report a patient's

34

elevated blood pressure. But Johnson – the decisionmaker – knew at the time of termination, based on her own investigation, that this was false. Prior to the termination, Johnson herself investigated the incident and learned that the time on the applicable machine was in fact four (4) hours behind, as Sanusi had consistently claimed. [Doc. 106-7, p. 37-41; Doc. 106-8, p. 87-88]. Sanusi was not wrong, the doctor was. Accordingly, a jury could conclude that Johnson did not honestly believe that Sanusi violated any applicable protocols, which themselves impose no time limit. [*See* Doc. 101-18, p. 3-5].

Further, even if it were true that Sanusi failed to rebut Grady's articulated reason – which it is not – Sanusi's case should nevertheless proceed to a jury because there is more than enough evidence to form a convincing mosaic of discrimination such that a jury could find that Johnson terminated her because of Johnson's open and express hostility towards Africans on the Unit.

In *Casagrande v. OhioHealth Corp.*, 666 F. App'x 491 (6th Cir. 2016), the hospital claimed it terminated a nurse for multiple patient safety issues and failure to follow nursing policy. *Casagrande*, 666 F. App'x at 495, 500. The nurse claimed the real reason for termination was retaliation for his exercise of FMLA rights. *Id*. at 499. The Sixth Circuit concluded that it was clear that the hospital's proffered reasons for termination had a basis in fact "or, at a minimum, were the result of an honest belief." *Id*. at 500. Nevertheless, the Court reversed summary

35

judgment for the hospital because there was sufficient evidence from which a reasonable jury could conclude that these reasons did not actually motivate the termination. *Id.* This evidence includes the testimony of coworkers that, in their view, the supervisor scrutinized the plaintiff's performance more closely than that of other nurses. *Id.* at 501.[9]

This is the correct result. The ultimate question is not whether Grady honestly believed that Sanusi violated a work rule. The ultimate question is whether Grady – acting through Johnson – terminated Sanusi because she is African and/or because she opposed discrimination. *Tynes*, 88 F.4th at 946 (Newsom, J., concurring). At the summary judgment stage, the employer's production of a legitimate reason for termination, and the employee's rebuttal of the reason, is merely one of many judge-made analytical tools to assess the sufficiency of evidence. It does not render an employer's version of events sacrosanct. Where, viewed as a whole, the record contains this evidence (which here is overwhelming) of discriminatory animus, it is for the jury to decide who to believe.

---

[9] The district court "did not credit this testimony" because the coworkers lacked personal knowledge regarding the termination decision itself. *Id.*

Johnson, the individual who terminated Sanusi, made a pie chart of the national origins of the nurses on the Unit, for the express purpose of reducing the percentage of Africans in the Unit. A third-party witness and Plaintiff Banks both provided sworn testimony that Johnson stated that she would not consider resumes with African-sounding names. Johnson repeatedly made negative statements about Africans, stated that she refused to share an office with a newly-hired African nurse, and stressed the need for hiring "diversity" to dilute the percentage of Africans on the Unit, which she considered to be too high. Third-party witness Carlotta Gabriele provided a declaration stating¸ *inter alia*, that (1) "Johnson told me that there were too many Africans in the Unit and some of them needed be gotten rid of."; (2) Johnson more heavily scrutinized non-American nurses; and (3) based on her observation, "Johnson was unfairly nitpicking Ms. Sanusi's performance…" [Doc. 106-24 at p. 2-3, 5, ¶¶ 6, 9, 16].

Both the Magistrate Judge and the District Court failed to appreciate this evidence, in succession. The Magistrate Judge disregarded Gabriele's testimony because Gabriele herself is not African and/or because the Magistrate Judge concluded the testimony was "redundant," "based on second-hand accounts rather than personal knowledge, and/or conclusory." [Doc. 121, p. 43 n. 10].

The Magistrate Judge's categorical rejection of the non-movants' evidence at summary judgment turns the applicable standard on it is head, and is based on

37

nonsensical rationale with no relationship to the rules of evidence. The nationality of the witness to a statement or event does not matter at all.[10] It equally does not matter whether a witness to discriminatory statements is herself a member of the protected group being discriminated against. The Magistrate further discounted Johnson's discriminatory remarks because Sanusi herself did not witness them. [Doc. 121 at p. 41 ("What's more, Sanusi herself never even witnessed any discriminatory remarks from Johnson.")]. Under the Magistrate's construction, it would presumably not matter if Johnson said, "I intend to fire Sanusi because she is African," as long as she said it out of Sanusi's earshot. This cannot be, and is not, the law. The Federal Rules of Evidence do not dictate who can and cannot observe relevant statements and events.

The Magistrate Judge's other criticisms of Sanusi's evidence of discriminatory animus are simply false. Ms. Gabrielle provided testimony about Johnson's statements and conduct that she personally observed. Her account is based on her personal knowledge, not speculation, and states facts observed, not

---

[10] The Magistrate Judge seemingly largely disregarded the declarations as a whole because two of the non-American declarants, who also felt discriminated against by Johnson, were not African. [Doc. 121, p. 43 n. 10]. The fact Ms. Gabrielle, a non-American who is not from Africa, also felt discriminated against by Johnson does not somehow invalidate her own personal knowledge about Johnson's discriminatory statements and conduct regarding the Unit's African employees. [Doc. 106-24, p. 2-5, ¶¶ 4, 6, 7, 9, 12, 16].

conclusions.  [Doc. 106-24, p. 2-5, ¶¶ 6, 7, 9, 12, 14].  Plaintiff Banks personally observed and provided testimony about the discriminatory statements as well – they formed the basis for her protected activity.  [Doc. 106-22, p. 1-3, ¶¶ 3-7, 11-12; Doc. 121, p. 23-24].

The Magistrate Judge spent the majority of its analysis of Sanusi's claim applying *McDonnell Douglas* and addressing the absence of a direct comparator using that framework [Doc. 121, p. 37-39, 41, 46], notwithstanding that Sanusi at all times opposed summary judgment using a convincing mosaic analysis, and never argued she had provided a comparator under this Court's high standard, most recently announced in *Lewis v. City of Union City*, *Georgia*, 934 F.3d 1169, 1185 (11th Cir. 2019).  [*See* Doc. 105 (referencing "convincing mosaic" ten times)].  As this Court has repeatedly made clear, and most recently in *Tynes*, it is not necessary to establish a comparator to survive summary judgment.  *Tynes*, 88 F.4th at 946.

The District Court's Order, which block quotes whole pages of the Magistrate Judge's analysis that studiously rejected and downplayed Plaintiff's evidence, spends less than three pages analyzing Sanusi's claims.  [Doc. 135 at p. 29-32].  That sparse analysis focuses entirely on Grady's purported reasons for termination, concludes that Sanusi fails to rebut Grady's articulated reason for

termination (incorrect, for the reasons described above), and finds that Grady's reasons for Sanusi's termination had not shifted over time. [*Id.*].

The problem with the latter part of this conclusion is that Grady's reasons for Sanusi's termination have shifted over time, and in a material way. On October 2, 2020, Lescota recommended termination of Sanusi primarily on the grounds that Sanusi was allegedly insubordinate based on Johnson's description of a meeting that same day with Sanusi, and Johnson's claim that Sanusi had left while Johnson was still speaking. [Doc. 106-9, p. 206-208; Doc. 106-11, p. 312-313].

Grady initially reiterated the insubordination grounds in this case. [*See* Doc. 106-28 at p. 4 (In addition to referencing the alleged patient care issues, stating "[d]uring the investigation into the incident, Plaintiff Sanusi failed to cooperate, exhibited insubordinate behavior, and stormed out of the meeting with her director and another director. She was subsequently terminated.")]. However, then Johnson, Bennett and Sanusi all testified that the October 2, 2020 meeting concluded in a "professional manner," Sanusi conducted herself in a "professional manner," and Sanusi left when the meeting was over and was in no way insubordinate. [Doc. 106-5 at 277:8-10, 283:7-14 (Johnson provided this testimony on direct examination, then changed her testimony following a break during which she spoke with counsel [*see id.* 288:2-291:11]); Doc. 106-14, p. 207-209); Doc. 106-23 ¶ 20]. Insubordination, an original primary driver behind

40

Sanusi's termination, has now disappeared from Grady's explanation.  This shifting reason can of course allow a jury to find that the real reason was discriminatory or retaliatory animus.  *See Cleveland v. Home Shopping Network, Inc.*, 369 F.3d 1189, 1194 (11th Cir. 2004).

The bottom line is that the Magistrate Judge and District Court (1) improperly deployed *McDonnell-Douglas* as a vehicle to push aside Sanusi's evidence of discriminatory animus, (2) found and invented new ways of minimizing that evidence (to include that a plaintiff must herself hear discriminatory remarks for them to be probative and third-party witnesses must themselves be of a protected class in order to provide testimony), (3) misapplied the honest belief doctrine and instead instituted an employer-infallibility doctrine, and (4) chose to ignore Grady's shifting reasons for Sanusi's termination.  A reasonable jury could conclude that a decisionmaker who professed a desire to terminate African employees generally could have been motivated by that desire when she terminated this African employee specifically.  This is particularly true when the decisionmaker knew that the purported reason for the termination was false.

### C.    A Jury Should Decide Whether Banks Was Constructively Discharged.

Finally, there is enough evidence for Banks's constructive discharge claim to go to a jury in the context of this case.  Constructive discharge exists when the

employer makes the working environment so intolerable that the employee's resignation qualifies as a fitting response. *Penn. State Police v. Suders*, 542 U.S. 129, 134 (2004). The constructive discharge claim is distinct from the underlying retaliatory act. *Green v. Brennan*, 578 U.S. 547, 559 (2016). There are two species of constructive discharge claims—claims based on an egregious harassment (so called "compound" hostile environment plus claims), and claims based on employer actions. *Suders*, 542 U.S. at 134, 146-47; *Boandl v. Geithner*, 752 F. Supp. 2d 540, 573 (E.D. Pa. 2010). This case presents the latter non-compound type, to which the *Faragher/Ellerth* defense does not apply. *Suders*, 542 U.S. at 140-41. The employee is <u>not</u> required to prove in a constructive discharge claim that "that [her] quitting was [her] employer's plan all along." *Green*, 578 U.S. at 560.

Employers can create an intolerable environment in a variety of ways, which include changes in employee status. *Suders*, 542 U.S. at 134. Courts have found employer actions that may constitute constructive discharge include:

i.   evidence of supervisors' efforts to remove plaintiff, transfer, and office relocation (*Stremple v. Nicholson*, 289 F. App'x 571, 572-574 (3d. Cir. 2008));

ii.  demotion of employee who had opposed "overt and unabashed pattern of discrimination," notwithstanding that demotion did not affect salary or benefits (*Bryant v. Jones*, 575 F.3d 1281, 1290, 1298-99 (11th Cir. 2009));

iii. negative evaluations and discriminatory comments to an employee who reasonably believed that she would be fired if she did not resign (*E.E.O.C. v. Univ. of Chicago Hosps.*, 276 F.3d 326, 331-33 (7th Cir. 2002)); and

iv.  negative evaluations, ageist comments, and insufficient training to an employee who reasonably believed she was at risk for losing her job (*Acrey v. Am. Sheep Indus. Ass'n*, 981 F.2d 1569, 1572-75 (10th Cir. 1992)).

The intolerability inquiry is context-specific and can and does vary by employer, employee and case. *See, e.g., Washington v. Ill. Dep't of Revenue*, 420 F.3d 658, 662 (7th Cir. 2005) (recognizing that forms of retaliation, such as playing Muzak to retaliate against employee with a nervous condition, might render a working environment intolerable, resulting in a constructive discharge).

Here, after Banks endured months of abuse from her supervisor, resulting in distress requiring medical intervention, and after Banks previously complained to HR, she was issued a retaliatory Final Written Warning that immediately changed her employment status and threatened her with career-altering termination, while

that same supervisor freely referenced her prior discrimination complaints.[11] Banks was directed to sign the retaliatory Final Written Warning or be fired on the spot. A jury could find that her resignation was "a fitting response." *Suders*, 542 U.S. at 134.

## <u>CONCLUSION</u>

The District Court mistakenly concluded that a reasonable jury could not rule in Plaintiffs' favor despite the compelling evidence of retaliation and discrimination.  Plaintiffs respectfully request the Court reverse the lower court decision on summary judgment.

---

[11] Under the continuing-violation doctrine, the Court may consider Johnson's retaliatory conduct falling outside of the 180-day period preceding Banks's filing of her EEOC Charge because the retaliation continued in the 180-period preceding the EEOC Charge, culminating in the Final Written Warning, and forms part of the same claim.  *See Nat. R.R. Passenger Corp. v. Morgan*, 536 U.S. 101, 115-21 (2002).

Respectfully submitted this 7th day of March 2024.

/s/Justin M. Scott
Justin M. Scott
Georgia Bar No. 557463
RADFORD SCOTT LLP
160 Clairemont Avenue, Suite 610
Decatur, Georgia 30030
Telephone: 678.780.4880
Facsimile: 478.575.2590
jscott@radfordscott.com

Counsel for Appellants

## <u>CERTIFICATE OF COMPLIANCE WITH TYPE-VOLUME LIMIT</u>

Counsel for Appellants hereby certifies that this brief complies with the type-volume limitation set forth in FRAP 32(a)(7)(B).  This brief contains 10,037 words, excluding those parts exempted by 11th Cir. Local R. 32-4.

This brief complies with the typeface requirements of Fed. R. App. P. 32(a)(5) and the type style requirements of Fed. R. App. P. 32(a)(6) as this brief has been prepared in a proportionally spaced typeface using Microsoft Word in 14 point Times New Roman font.

RADFORD SCOTT LLP

*/s/ Justin M. Scott*
Justin M. Scott
Georgia Bar No.: 557463
jscott@radfordscott.com

46

## <u>CERTIFICATE OF SERVICE</u>

This is to certify that I have this 7th day of March 2024, filed this **Initial Brief of Appellant Samantha Banks, et al.** using the CM/ECF system which will automatically send e-mail notification of such filing to all attorneys of record.

*/s/ Justin M. Scott*
Justin M. Scott
Georgia Bar No. 557463
RADFORD SCOTT LLP
160 Clairemont Avenue, Suite 610
Decatur, Georgia 30030
Telephone: 678.780.4880
Facsimile: 478.575.2590
jscott@radfordscott.com

Counsel for Appellants
