No. 23-13376

UNITED STATES COURT OF APPEALS
FOR THE ELEVENTH CIRCUIT

SAMANTHA BANKS, ET AL.,

*Plaintiffs-Appellants,*

*v.*

GRADY MEMORIAL HOSPITAL CORP.,

*Defendant-Appellee.*

Appeal from the United States District Court for the
Northern District of Georgia
Hon. Eleanor L. Ross, District Judge
Case No. 1:21-CV-00627-ELR

## BRIEF OF APPELLEE
## GRADY MEMORIAL HOSPITAL CORP.

Leslie K. Eason
*Counsel of Record*
BARNES & THORNBURG LLP
3340 Peachtree Rd NE
Suite 2900
Atlanta, GA 30326-1092
Telephone: 404-264-4085
Email: leslie.eason@btlaw.com

Kian J. Hudson
BARNES & THORNBURG LLP
11 South Meridian Street
Indianapolis, IN 46204
Telephone: 317-229-3111
Email: kian.hudson@btlaw.com

*Counsel for Appellee Grady Memorial Hospital Corp.*

## CERTIFICATE OF INTERESTED PERSONS AND CORPORATE DISCLOSURE STATEMENT

Appellee Grady Memorial Hospital Corp., by and through undersigned counsel and pursuant to Federal Rule of Appellate Procedure 26.1 and Eleventh Circuit Rule 26.1-2, hereby certifies that the persons or entities listed below have or may have an interest in the outcome of this case:

Banks, Samantha – Appellant/Plaintiff

Barnes & Thornburg LLP – Counsel for the Appellee

Cannon, Hon. Regina D., United States Magistrate Judge

Eason, Leslie – Counsel for Appellee

Fulton-DeKalb Hospital Authority – related to Appellee

Gordon Rees Scully Mansukhani, LLP – Counsel for the Appellee

Grady CASS, Inc. – related to Appellee

Grady EMS, LLC– related to Appellee

Grady Memorial Hospital Corporation d/b/a Grady Health System - Appellee

Grady Memorial Hospital Corporation (includes Hughes Spalding Children's Hospital) – related to Appellee

Grady Ponce, Inc. – related to Appellee

Grady WIC, Inc. – related to Appellee

Grady Health Foundation – related to Appellee

i

Hudson, Kian – Counsel for the Appellee

Monteiro, Tierra M. – Counsel for Appellants

Myers, Kimberly B. – Counsel for Appellee

One Grady, LLC– related to Appellee

Radford Scott LLP – Counsel for Appellants

Reliant Emergency Specialties, Inc. – related to Appellee

Ross, Hon. Eleanor L., United States District Court

Sanusi, Amy – Appellant/Plaintiff

Scott, Justin M. – Counsel for Appellants

## STATEMENT REGARDING ORAL ARGUMENT

Appellee Grady Memorial Hospital Corp., pursuant to Federal Rule of Appellate Procedure 34(a) and Eleventh Circuit Rule 28-1(c), hereby states that it believes that the straightforward issues raised in this appeal do not warrant oral argument. That said, if the Court believes that oral argument will be helpful in considering these issues, Grady welcomes the opportunity to present oral argument.

# TABLE OF CONTENTS

**Page**

CERTIFICATE OF INTERESTED PERSONS AND CORPORATE DISCLOSURE STATEMENT ................................................................. i

STATEMENT REGARDING ORAL ARGUMENT ............................... iii

TABLE OF CONTENTS .......................................................... iv

TABLE OF AUTHORITIES ....................................................... v

STATEMENT OF THE ISSUES ON APPEAL ...................................... 1

STATEMENT OF THE CASE ...................................................... 3

   I.   Grady Hospital's Organizational Structure ................................... 3

   II.   Samantha Banks ......................................................... 4

   III.   Amy Sanusi ............................................................. 12

   IV.   Procedural History ..................................................... 17

   V.   Standard of Review .................................................... 20

SUMMARY OF THE ARGUMENT ............................................... 20

ARGUMENT ......................................................................... 22

   I.   Banks's claims for retaliatory discipline and constructive discharge both fail because she cannot show that Grady's legitimate reasons for discipline were pretextual ..................... 22

   II.   Banks's constructive discharge claim further fails because she voluntarily resigned and was not presented with a choice between resignation or termination. ................................. 33

   III.   Sanusi's claims fail because she cannot establish that Grady's legitimate stated reasons were pretextual. ............................ 35

CONCLUSION ..................................................................... 43

CERTIFICATE OF COMPLIANCE ............................................... 44

# TABLE OF AUTHORITIES

**Cases**                                                                                                                 **Page(s)**

*Baxter v. Roberts,*
   54 F.4th 1241 (11th Cir. 2022) .............................................. 20, 28, 32

*Beltrami v. Special Couns., Inc.,*
   170 F. App'x 61 (11th Cir. 2006)....................................................... 34

*In re Blue Cross Blue Shield Antitrust Litig. MDL 2406,*
   85 F.4th 1070 (11th Cir. 2023) ..................................................... 24, 32

*Bryant v. Jones,*
   575 F.3d 1281 (11th Cir. 2009)........................................................... 33

*Casagrande v. OhioHealth Corp.,*
   666 F. App'x 491 (6th Cir. 2016)........................................... 40, 41, 42

*Christie v. United States,*
   518 F.2d 584 (1975) ........................................................................... 35

*Gilley v. Kelly & Picerne, Inc.,*
   No. 1:14CV124-SRW, 2016 WL 814885 (M.D. Ala. Feb. 29,
   2016).................................................................................................... 32

*Gogel v. Kia Motors Mfg. of Georgia, Inc.,*
   967 F.3d 1121 (11th Cir. 2020)................................................. *passim*

*Hargray v. City of Hallandale,*
   57 F.3d 1560 (11th Cir. 1995)........................................................... 35

*Hipp v. Liberty Nat. Life Ins. Co.,*
   252 F.3d 1208 (11th Cir. 2001)................................................... 33, 34

*Johnson v. Miami-Dade Cnty.,*
   948 F.3d 1318 (11th Cir. 2020)......................................................... 25

*Lewis v. City of Union City, Ga.,*
   918 F.3d 1213 (11th Cir. 2019) (en banc) ................................. 20, 23

## Cases [cont'd]

*Medearis v. CVS Pharmacy, Inc.*,
  646 F. App'x 891 (11th Cir. 2016) ....................................................... 33

*Rojas v. Fla.*,
  285 F.3d 1339 (11th Cir. 2002) .......................................................... 25

*Rowell v. BellSouth Corp.*,
  433 F.3d 794 (11th Cir. 2005) ..................................................... 22, 34

*Sapuppo v. Allstate Floridian Ins. Co.*,
  739 F.3d 678 (11th Cir. 2014) ........................................................... 24

*Thomas v. Sheriff of Jefferson Cnty., Alabama*,
  No. 22-13875, 2023 WL 6534602 (11th Cir. Oct. 6, 2023) ................ 23

*Tynes v. Fla. Dep't of Juv. Just.*,
  88 F.4th 939 (11th Cir. 2023) ............................................... 22, 23, 36

*Upshaw v. Ford Motor Co.*,
  576 F.3d 576 (6th Cir. 2009) ............................................................. 41

*Wallace v. Dunn Const. Co.*,
  62 F.3d 374 (11th Cir. 1995) ............................................................. 35

*Walton v. Johnson & Johnson Servs., Inc.*,
  347 F.3d 1272 (11th Cir.2003) .......................................................... 33

## Statutes

42 U.S.C. § 2000e .................................................................................. 22

## Other Authorities

Eleventh Circuit Local Rule 28-5 ............................................................ 3

## STATEMENT OF THE ISSUES ON APPEAL

Amy Sanusi and Samantha Banks were nurses in Grady Memorial Hospital's Mother Baby Unit. Both struggled with performance issues and infighting with other members of the Unit. And among other conflicts, each clashed with Tabitha Johnson, the Unit's manager.

Banks's conflict with Johnson culminated in a meeting with Johnson and Nicole Lescota (Johnson's supervisor) to discuss multiple complaints regarding Banks's competency. Following the meeting, Banks contacted the complainants—in direct contravention of Grady policy and her supervisors' orders. When Johnson and Lescota discovered the insubordination, they presented Banks with a final written warning. In the face of this warning, Banks resigned.

Similarly, Johnson met with Sanusi to discuss multiple reports of Sanusi's substandard patient care. Following that meeting, Johnson discussed the situation with Lescota and Deonte Fuller (the Unit's human resources administrator). Lescota and Fuller recommended issuing a final warning or terminating Sanusi, but advised Johnson to wait and allow Sanusi to prepare a written statement in her defense. When Sanusi failed to prepare this statement, she was terminated.

Following Banks's resignation and Sanusi's termination, they brought this consolidated suit, which claims that their discipline was due to unlawful retaliation (and, in Sanusi's case, unlawful national-origin discrimination). The district court rejected all these claims, concluding that Banks failed to show that Grady's non-discriminatory reasons for disciplining her were pretextual, and that Banks was not constructively discharged. It likewise concluded that Sanusi failed to show that Grady's non-discriminatory reasons for her termination were pretextual. *See* ECF 135 (Op.) at 18–32. This appeal thus presents the following issues:

1. Has Banks failed to present evidence that would permit a jury to find that Grady's stated legitimate, non-discriminatory reason for disciplining her was a pretext for unlawful retaliation?

2. Has Banks failed to show that Grady's decision to reprimand her for insubordination made her conditions of employment so unbearable that it effectuated a constructive discharge?

3. Has Sanusi failed to present evidence that would permit a jury to find that Grady's stated legitimate, non-discriminatory reasons for terminating her were pretext for unlawful retaliation or discrimination?

2

## STATEMENT OF THE CASE

## I.    Grady Hospital's Organizational Structure

This case concerns personnel issues within Grady Memorial Hospital's Mother Baby Unit and involves members of hospital staff from both inside and outside the Unit. As such, it is helpful to briefly describe the hospital's organizational structure and the relations among staff.

Grady Hospital is divided into a number of departments, including the Department of Women's Services. The Department of Women's Services itself encompasses a number of units, including the Mother Baby Unit. Relevant here, Nicole Lescota, the Vice President of Women's Services, directly oversees the Director of the Mother Baby Unit. ECF 106-9 (Lescota Dep.) at 13.[1] The Director of the Mother Baby Unit in turn oversees the entirety of the Unit and is responsible for ensuring it operates productively. ECF 106-5 (Johnson Dep.) at 51-52.

Below the Unit's Director are the multiple Clinical Staff Managers ("CSMs"). Among other duties, CSMs supervise the nurses within the

---

[1] In accordance with Eleventh Circuit Local Rule 28-5, this brief cites to all record documents, including transcripts, using the page number that appears in the header generated by the district court's electronic filing system (rather than using the document's internal pagination).

Unit and are responsible for quality control, including by going room-to-room to check with patients and get feedback on nursing performance. *Id.* at 22, 26. Finally, within the general nursing population there are often experienced nurses who are paid to help teach newer hires. These experienced nurses, called preceptors, oversee the newer nurses and bear ultimate responsibility for their work. *Id.* at 260.

## II.    Samantha Banks

In March 2019, Grady hired Banks as a nurse in the Mother Baby Unit. ECF 106-1 (Banks Dep.) at 50. At that time, she was supervised by Johnson, who was a CSM in the Mother Baby Unit. ECF 106-5 (Johnson Dep.) at 51-53. Banks alleges that Johnson's tenure as CSM (and eventually the Unit's Director) included discriminatory behavior in favor of the American nurses to the detriment of the Unit's African nurses.

In particular, in April 2019 Banks alleged that Johnson made derogatory comments about African nurses. ECF 104-1 (Banks SMF) at 1, ¶1. Banks states that she reported these comments to the Unit's Director, but the Director does not remember being told about these comments and there is no evidence that the Director told Johnson. ECF 103-9 (Laka Decl.) at 2, ¶6. In or around July 2019, to improve her

communication and leadership with the Unit, Johnson sought to educate herself on the different cultures represented therein. ECF 106-5 (Johnson Dep.) at 59–60. To accomplish this, Johnson made a pie chart describing the Unit's demographics. ECF 104-1 (Banks SMF) at 2–3, ¶¶3–7. Johnson presented her findings to the Unit's nurses, and Banks alleges that after the presentation Johnson stated that there were too many African nurses and that the Unit needed to dilute their numbers. *Id.* at 2, ¶5. Banks then told Johnson that she was 99% African. *Id.* at ¶4. Once again, Banks states that she reported these comments to the Unit's Director, who indicated that she would discuss this with Johnson. *Id.* at 2–3, ¶¶4, 7. Like the previous complaint, the Director does not remember being told about these comments and there is no evidence that the Director followed up with Johnson. ECF 103-9 (Laka Decl.) at 2, ¶8.

In September 2019, Banks was promoted to CSM alongside Johnson. ECF 106-5 (Johnson Dep.) at 54. Banks asserts that this promotion did nothing to improve her relationship with Johnson. ECF 104-1 (Banks SMF) at 3–4, ¶10. On November 25, 2019, Banks once again complained to the Unit's Director that Johnson was hostile to her, and Banks claimed that Johnson discriminated against her in retaliation for

her previous complaints. *Id.* at 4, ¶11. Two days later, on November 27, Banks re-raised her complaints to Grady's head of human resources in an email. *Id.* at 5, ¶14. On December 3, Banks followed up and asked that Deonte Fuller, the human resources manager for the Mother Baby Unit, not be involved with the investigation because he was biased in favor of Johnson. *Id.* at 5–6, ¶17.

Following Banks's December 3 email, human resources interviewed Johnson about Banks's complaint. ECF 103-2 (Grady SMF Banks) at 12, ¶¶51–54. This was the first time Johnson learned that Banks had complained about her. *Id.* at 13, ¶55. Although Johnson admitted that she took the complaint personally, she was not surprised because complaints "happen[] a lot with leadership." ECF 106-7 (Johnson Second Dep.) at 71. Following Johnson's interview, on December 16, 2019, human resources completed the investigation and concluded that Banks's discrimination allegations were unsubstantiated. ECF 103-2 (Grady SMF Banks) at 13, ¶56; ECF 106-18 (Fuller Dep.) at 55–56. On December 18, 2019, Johnson was promoted to interim Director of the Mother Baby Unit. ECF 106-5 (Johnson Dep.) at 158; ECF 104-1 (Banks SMF) at 7, ¶23.

In January 2020, Nicole Lescota was hired as the Vice President of Women's Services and began evaluating candidates (including Johnson) to be permanent Director of the Mother Baby Unit. ECF 106-9 (Lescota Dep.) at 15. In February 2020, as part of the interview process, Johnson sat for a staff panel interview; Banks and Amy Sanusi were among the panelists asking questions to Johnson. ECF 103-2 (Grady SMF Banks) at 14, ¶63; ECF 105-1 (Sanusi SMF) at 4, ¶14. In response to a question about the division between African and American nurses within the Unit, Johnson told the panelists that she had requested that human resources send her diverse nursing candidates: "[S]end me diversity, I need diversity" and that "you can't have too much of the same." ECF 106-5 (Johnson Dep.) at 178.

After the interview, the panelists met with Lescota to debrief and evaluate Johnson's interview. ECF 104-1 (Banks SMF) at 9, ¶31. Banks raised concerns about Johnson's behavior towards African nurses and the evaluation turned into a broader discussion on national origin. *Id.*, ¶¶31–32. Following her post-panel conversation, Lescota met with Johnson to discuss generalized concerns, but Lescota did not indicate the sources of the concerns. ECF 106-9 (Lescota Dep.) at 87–88; ECF 106-5 (Johnson

Dep.) at 182 ("Q. Did Ms. Lescota tell you what the concerns were that were expressed to her in that [February 2020] meeting? A. No."). She also checked in with Fuller, who told her that human resources' prior investigation into Banks's allegations found no wrongdoing. ECF 106-9 (Lescota Dep.) at 38–39. Following these discussions, Lescota hired Johnson as the permanent Director of the Unit, ECF 104-1 (Banks SMF) at 11, ¶37—a choice Banks hailed as "the perfect decision." ECF 103-2 (Grady SMF Banks) at 16, ¶72; ECF 106-1 (Banks Dep.) at 177.

On April 30, 2020, Lescota and Johnson met with Banks to address some negative feedback concerning Banks's performance as CSM. ECF 103-2 (Grady SMF Banks) at 18, ¶81; ECF 104-1 (Banks SMF) at 12, ¶40. Johnson and Lescota each testified that this meeting included discussion of multiple, distinct complaints. ECF 103-2 (Grady SMF Banks) at 17–18, ¶¶78–81; ECF 106-9 (Lescota Dep.) at 103–106.

The first complaint was from Grady's NICU Director, who complained that Banks was unable to help her transfer a baby from NICU to the Mother Baby Unit because "[Banks] did not know how to admit a baby." ECF 106-9 (Lescota Dep.) at 99–100.

8

The second complaint was from Chineny "Chi Chi" Ndukwe. *Id.* at 106. According to the statement Chi-Chi provided to Johnson and Lescota, on April 29, 2020 Chi Chi repeatedly asked Banks for help with her workload and in response, Banks "started laughing" and then "got up and left the unit." ECF 106-11 (Lescota Dep. Exhibits) at 287.

The third complaint was from a recently hired CSM. ECF 106-9 (Lescota Dep.) at 107. The new hire approached Lescota and asked to change shifts because she "was having a hard time learning from [Banks]" and "[Banks] didn't seem to be able to manage the shift and . . . manage the workload." *Id.* at 108. The new hire doubted that Banks was "a good example . . . to learn from." *Id.*

Lescota and Johnson both testified that they instructed Banks not to contact *any* of the complainants mentioned at the April 30 meeting. *Id.* at 124 ("I asked her not to approach any of the associates that came forward and question them."); ECF 106-5 (Johnson Dep.) at 221 ("[Lescota] told [Banks], Do not go back and talk to any of these employees. Don't go back to ChiChi... [Lescota] told [Banks] do not make contact with them asking them about this situation."). Further, Lescota's contemporaneous notes—written immediately after the interview—state

9

that Lescota "asked [Banks] not to approach any of the associates that came forward and question them. I asked her to promise that she would not do that.") ECF 106-9 (Lescota Dep.) at 126; ECF 106-11 (Lescota Dep. Exhibits) at 288.

For her part, Banks acknowledges that the April 30, 2020 meeting involved discussing complaints about her managerial style. ECF 106-1 (Banks Dep.) at 11–13, 18–21. Banks also *admits* that they discussed Chi Chi's April 29, 2020 complaint, *id.* at 18–21, and *has not disputed* that the other two complaints were discussed either; instead, Banks testified only that she does not recall what the other complaints were. *Id.* at 21. Banks also testified that a fourth complaint was discussed, from a nurse who complained that Banks did not know how to set up an IV. *Id.* at 14. Further, Banks testified that she remembers "being asked not to contact [the nurse] about my IV starting skills[]." *Id.* at 25. Banks claims that she does not remember being told to avoid talking to anyone else about the allegations. *Id.* at 25 ("Q. So you remember being told not to talk to Daniella [IV Complainant], but you don't remember being told not to talk to anyone about the allegations? A. Correct.").

After the April 30th meeting, Banks reached out to some of the complainants, including Chi Chi. ECF 103-2 (Grady SMF Banks) at 20, ¶84. Banks *admits* that she reached out to Chi Chi to discuss the April 29, 2020 incident. ECF 104-1 (Banks SMF) at 13, ¶43. And Johnson received calls from Chi Chi and another complainant letting her know that Banks reached out to them. ECF 103-2 (Grady SMF Banks) at 20, ¶84.

After Johnson received these calls, she reached out to Lescota alerting her to the development, describing Banks's calls as "clear insubordinate behavior." *Id.* Lescota discussed the situation with Fuller and they decided to give Banks a final written warning, "based solely on the insubordination[.]" ECF 106-9 (Lescota Dep.) at 137. Although Johnson was part of the discussion, Lescota testified that she and Fuller made the decision to issue the final written warning. *Id.* at 135.

On May 6, 2020, Lescota and Johnson met with Banks to discuss her insubordination and underscored how important it was not to contact employees during the course of an impending investigation. ECF 103-2 (Grady SMF) at 22, ¶94. In the context of making this point, Johnson referred to the investigation into Banks's December 2019

11

complaint against Johnson, where Johnson was likewise instructed not to contact Banks. *Id.* at 22–23, ¶95. Lescota and Johnson then presented Banks with the final written warning. ECF 104-1 (Banks SMF) at 13-14, ¶46. Banks refused to sign the warning, explaining that she did not agree with it and wanted to avoid the consequences of signing such a warning: "[H]aving a final written warning in her personnel file would . . . prevent Banks from receiving a transfer or promotion within Grady for up to 12 months, and substantially harm Banks's job prospects outside of Grady given the strong stigma associated with such disciplinary measures." *Id.* at 14, ¶48. Banks also testified that she was distrustful that Johnson or Lescota would give her a good recommendation if she signed the final written warning. ECF 106-22 (Banks Decl.) at 6, ¶22. Accordingly, Banks left the meeting and resigned. ECF 103-2 (Grady SMF Banks) at 23, ¶98.

## III.  Amy Sanusi

Amy Sanusi is from Sierra Leone and was hired at Grady in 2017. ECF 105-1 (Sanusi SMF) at 1, ¶1; ECF 106-3 (Sanusi Dep.) at 17, 23. Sanusi's tenure at Grady was plagued by poor performance. In March 2019, Sanusi was written up for sleeping on the job, an offense that by

itself justifies termination. ECF 101-2 (Grady SMF Sanusi) at 2, ¶¶2–3. She also struggled with attendance, violating Grady's attendance policies seventeen times from April 2019 to November 2019. *Id.* at ¶4.

As noted, Sanusi participated in Johnson's February 2020 panel interview for the Unit's permanent Director position. ECF 105-1 (Sanusi SMF) at 4, ¶14. During and after the interview, Sanusi voiced her concerns that Johnson discriminated in favor of the Unit's American nurses and against the Unit's African nurses. *Id.* at 5, ¶¶16–17.

On September 17, 2020, a doctor filed an incident report documenting that Sanusi failed to take the vitals of two new mothers for twelve hours. ECF 101-2 (Grady SMF Sanusi) at 14, ¶¶61–62. Sanusi *does not dispute* that she failed to take the vitals; instead, Sanusi argues that the patients were assigned to a newly hired nurse and, thus, not her responsibility. ECF 105-1 (Sanusi SMF) at 9, ¶¶30–31. It is undisputed, however, that the newly hired nurse was still in training and that Sanusi was the preceptor on duty; the patients were thus her responsibility. ECF 101-2 (Grady SMF Sanusi) at 15, ¶¶65–66.

During the investigation into the September 17 incident report, another Grady supervisor found out that Sanusi lied about her conduct

regarding the two new mothers: She had "completed the shift assessments showing she had taken the blood pressures *despite not actually doing so.*" *Id.* at 14, ¶63 (emphasis added). Lescota also confirmed with the doctor that, based on the doctor's review of the events, he believed Sanusi had breached protocol. *Id.* at 15, ¶68. Like the sleeping-on-the-job infraction, Sanusi could have been (but was not) immediately terminated for this offense. *Id.*, ¶64.

Less than two weeks later, on October 2, 2020, Sanusi was the subject of another incident report. *Id.* at 16, ¶77. On October 2, Sanusi was the nurse for a new mother experiencing high blood pressure. *Id.*, ¶72. The mother's blood pressure spiked, resulting in two high blood pressure readings, one taken by Sanusi and another taken by a tech. *Id.*, ¶74. The spiking blood pressure indicated that the mother was in life-threatening danger, and Grady policy required Sanusi to alert the doctor immediately. *Id.*, ¶76–77. Sanusi admits that she failed to follow this policy: She went to help another patient instead of immediately reporting the readings to the doctor, as required by Grady policy. ECF 105-1 (Sanusi SMF) at 11, ¶¶35–36.

When Sanusi returned, she found the doctor in the patient's room and told the doctor, "I was just about to call you about the patient's pressure." ECF 101-2 (Grady SMF Sanusi) at 17, ¶78; ECF 105-1 (Sanusi SMF) at 11, ¶36. Sanusi then claimed (1) that the clock on the machine was wrong (i.e., that less time had elapsed since the spiking blood pressure reading than the clock indicated), and (2) that the blood pressure readings on the machine were from other patients. ECF 101-2 (Grady SMF Sanusi) at 17, ¶79. Although the subsequent investigation revealed that the clock on the machine was in fact wrong, the patient confirmed that Sanusi's second claim was false: The blood pressure readings were the patient's because the machine had not been removed from her room. *Id.*, ¶80. The doctor's independent, contemporaneous incident report further confirms that Sanusi lied about this. ECF 106-15 (Bennett Dep. Exhibits) at 20 ("When RN was confronted about issue, she lied and stated that none of the blood pressure readings on the machine in the patient's room belonged to the patient[.]"). Indeed, Sanusi *does not dispute* that she lied about which patient the readings belonged to.

Johnson met with Sanusi on the afternoon of October 2, 2020 to discuss the incident that had occurred earlier that day, and Johnson told

15

Sanusi to submit a written statement explaining her side of the story by October 5. ECF 101-2 (Grady SMF Sanusi) at 18, ¶84. Johnson then reached out to Lescota and Fuller to let them know that she had discussed the September and October incident reports with Sanusi and was giving her an opportunity to provide a written statement. *Id.*, ¶86. Lescota responded that, "[based] on her behaviors, I am concerned about the safety of our patients[.]" *Id.* at 19, ¶88. Lescota also reasoned that if Sanusi was "not amenable to coaching, as evidenced by her refusal to accept her responsibility . . . then I recommend termination." *Id.* Fuller agreed, but recommended that they give Sanusi the weekend to provide her statement before issuing any termination. *Id.*, ¶89. The plan was to terminate Sanusi, unless her statement included anything that warranted further consideration. *Id.* at 20, ¶91. Sanusi was suspended while her supervisors awaited her response. *Id.*, ¶92.

Sanusi never provided a written statement, and on October 5, Johnson called Sanusi and told her that the investigation had been completed. ECF 105-1 (Sanusi SMF) at 14, ¶47; ECF 101-2 (Grady SMF Sanusi) at 20, ¶93. The next day, October 6, Johnson and another administrator met with Sanusi and terminated her. ECF 105-1 (Sanusi

SMF) at 14, ¶48. The paperwork referenced the September 17 and October 2 incidents. *Id.* at 14–15, ¶48. Sanusi refused to sign the termination paperwork and left. ECF 101-2 (Grady SMF Sanusi) at 21, ¶95. Later that night, Johnson texted her brother discussing how difficult Sanusi's termination was and confirmed that Sanusi was terminated for patient care concerns and had nothing to do with discriminatory intent to "get rid of all the Africans." *Id.*, ¶¶97–98.

## IV.    Procedural History

On February 12, 2021, Plaintiffs filed their Complaint in this action under Title VII of the Civil Rights Act, 42 U.S.C. §§ 2000e *et seq.* ECF 1 (Compl.) at 1. Banks asserted claims for retaliatory harassment and discipline (Count IV) and retaliatory constructive discharge (Count V). *Id.* at 33, 36. On the retaliatory harassment and discipline claim, Banks referenced complaints about Johnson that she raised spanning from April 2019 to February 2020. *Id.* at 33–34. Banks then alleged that Johnson issued the final written warning in retaliation for these complaints. *Id.* at 35. For the constructive discharge claim, Banks alleged that Johnson forced Banks to resign by "telling her that she had to sign

an unwarranted and retaliatory final disciplinary document or she would be terminated[.]" *Id.* at 37.

Sanusi asserted claims for discriminatory termination (Count II) and retaliatory termination (Count III). *Id.* at 30, 32. In support of these claims, Sanusi alleged that her termination was caused by discrimination against her national origin and/or in retaliation against her for complaining about Johnson at the February 2020 panel interview for the permanent Director position. *Id.* at 31–32. The Complaint acknowledges that Grady provided a legitimate, non-discriminatory reason for terminating Sanusi, but it alleges that Grady's "reliance on her alleged failure to report a patient's blood pressure as justification for her termination was pretextual[.]" *Id.* at 31.

After a lengthy discovery process, Grady filed for summary judgment against both Banks and Sanusi. ECF 101 (Grady SJ Motion Sanusi); ECF 103 (Grady SJ Motion Banks). The Magistrate Judge recommended that Grady's motion be granted in a Report & Recommendation ("R&R"), ECF 121 (R&R) at 1, which was adopted by the district court, ECF 135 (Dist. Ct. Order) at 32.

First, the district court adopted the magistrate's conclusion that both of Banks's claims fail because Grady articulated a legitimate, non-discriminatory reason for disciplining Banks. *Id.* at 23. The district court concluded that Grady put forth evidence that Johnson and Lescota had a good-faith belief that they instructed Banks not to contact any of the complainants and, consequently, had a good-faith belief that Banks was insubordinate. *Id.* at 23–24. It then concluded that Banks did not put forward evidence that would permit a jury to find that this explanation was pretextual. *Id.* at 24–25. The district court also concluded that Banks's constructive discharge claim failed for the further reason that she did not resign due to retaliation, *id.* at 28, but instead resigned because she did not want to risk termination, *id.* at 28–29.

On Sanusi's claims, the district court adopted the magistrate's conclusion that Grady offered legitimate, non-discriminatory reasons for firing Sanusi—namely, patient safety. *Id.* at 30. The district court then concluded that Grady "possessed a good faith belief in the nondiscriminatory reasons for its action and that Plaintiff Sanusi fail[ed] to present evidence to the contrary." *Id.* at 31.

19

## V.    Standard of Review

This Court reviews decisions granting summary judgment de novo and will affirm "when no genuine issue of material fact exists and the moving party is entitled to judgment as a matter of law." *Lewis v. City of Union City, Ga.*, 918 F.3d 1213, 1220 n.4 (11th Cir. 2019) (en banc) (citations omitted). In determining whether a genuine issue of material fact exists, the Court will "view the evidence, draw all reasonable factual inferences, and resolve all reasonable doubts in favor of the non-movant." *Baxter v. Roberts*, 54 F.4th 1241, 1253 (11th Cir. 2022) (quotation marks and citation omitted). The Court, however, draws inferences "only to the extent supportable by the record," and requires the non-movant to present more than "a mere scintilla of evidence supporting [its] position." *Id.* (quotation marks and citations omitted). Where the non-movant has not made "enough of a showing that the jury could reasonably find for that party," the Court will affirm the grant of summary judgment. *Id.* (quotation marks and citation omitted).

## SUMMARY OF THE ARGUMENT

Grady Memorial Hospital is the largest hospital in the state of Georgia and is the city hospital for Atlanta. Grady's Mother Baby Unit

provides the critical care required for fragile newborns and their families during and following birth. And because Grady's Mother Baby Unit shoulders a considerable workload and tremendous responsibility, Grady has high expectations for the Unit's nursing staff, including that they work effectively with teammates and prioritize patient care.

The evidence conclusively establishes that Grady supervisors genuinely believed that Banks and Sanusi failed to meet these expectations. Banks flatly disobeyed instructions not to talk with colleagues who had complained about her. And Sanusi lied about two separate patient-care failures (and failed even to provide the requested written response to her supervisors' concerns).

Because Banks and Sanusi were disciplined or terminated for legitimate, non-discriminatory reasons, they can proceed past summary judgment *only* if they have provided enough evidence to allow a jury to conclude that these reasons were false *and* that retaliation or discrimination was the decisionmakers' true motivation. *Gogel v. Kia Motors Mfg. of Georgia, Inc.*, 967 F.3d 1121, 1136 (11th Cir. 2020). Neither Banks nor Sanusi has come close to doing so. For these reasons,

the Court should affirm the district court's grant of summary judgment on all claims.

Moreover, the district court correctly identified an additional, independently sufficient reason for rejecting Banks's retaliatory-discharge claim: Because she was not faced with an impermissible take-it-or-leave-it offer (i.e., resign or be terminated), she was not constructively discharged. *See Rowell v. BellSouth Corp.*, 433 F.3d 794, 805 (11th Cir. 2005). As this Court has held, difficult choices do not by themselves lead to constructive discharge. *Id.* at 806. The Court should thus affirm the grant of summary judgment on this claim as well.

## ARGUMENT

### I.  Banks's claims for retaliatory discipline and constructive discharge both fail because she cannot show that Grady's legitimate reasons for discipline were pretextual

It is an essential element of any retaliation or discrimination claim under Title VII that the adverse employment action have been taken "*because*" of the plaintiff's protected activity or protected characteristic. 42 U.S.C. § 2000e-3(a) (emphasis added); *accord* 42 U.S.C. § 2000e-2(a). Indeed, in "the mine-run discrimination case, the key issue is whether the employer engaged in some action, in the statute's words, 'because of' an employee's race, sex, religion, or other protected characteristic." *Tynes*

22

*v. Fla. Dep't of Juv. Just.*, 88 F.4th 939, 950 (11th Cir. 2023) (Newsom, J., concurring). In such cases, summary judgment turns on "whether there is a genuine dispute of material fact about that all-important causation issue." *Id.*

Accordingly, where, as here, the employer has "offer[ed] evidence of a valid, non-discriminatory justification for the adverse employment action," the plaintiff *must* present evidence that would allow a reasonable jury to find that the adverse employment action was *actually* caused by an unlawful motive. *Tynes*, 88 F.4th at 944 (majority op.). That is, the plaintiff must show that the jury could find "not only that the employer's justification was pretextual, but that the real reason for the employment action was discrimination." *Id.* And because this question constitutes "'the plaintiff's ultimate burden'" under Title VII, the plaintiff must make this showing under *any* analytical framework. *Id.* (quoting *Lewis*, 918 F.3d at 1221); *see also Thomas v. Sheriff of Jefferson Cnty., Alabama*, No. 22-13875, 2023 WL 6534602, at *6 (11th Cir. Oct. 6, 2023) (noting that "the whole convincing mosaic inquiry is identical to the final stage of the *McDonnell Douglas* framework: both ask whether there is enough

23

evidence for a reasonable jury to infer intentional discrimination" (quotation marks and citation omitted)).[2]

Further, this Court has held that "to establish pretext at the summary judgment stage," the employee "must meet that reason head on and rebut it" by "demonstrat[ing] such weaknesses, implausibilities, inconsistencies, incoherencies, or contradictions in the employer's proffered legitimate reasons for its action that a reasonable factfinder could find them unworthy of credence." *Gogel*, 967 F.3d at 1136 (quotation marks and citations omitted). And of course the plaintiff must show "*both* that the reason was false *and* that retaliation was the real reason." *Id.* (brackets, quotation marks, and citation omitted).

Here, Lescota and Fuller decided to give Banks a final written warning, "based solely on the insubordination[.]" ECF 106-9 (Lescota Dep.) at 135, 137. This is an established, legitimate, and non-retaliatory reason for discipline, especially given the critical role the Mother Baby Unit plays in caring for fragile newborns and recovering mothers. *See*

---

[2] Regardless, Banks has not made a convincing mosaic argument on appeal and has therefore forfeited any argument on that score in any event. *See, e.g., Sapuppo v. Allstate Floridian Ins. Co.*, 739 F.3d 678, 680 (11th Cir. 2014); *In re Blue Cross Blue Shield Antitrust Litig. MDL 2406*, 85 F.4th 1070, 1092 (11th Cir. 2023).

*Johnson v. Miami-Dade Cnty.*, 948 F.3d 1318, 1327 (11th Cir. 2020) ("punishing insubordination [is] legitimate, important concern[]"); *Rojas v. Florida*, 285 F.3d 1339, 1342 (11th Cir. 2002) ("failure to follow department procedures" is legitimate, non-discriminatory reason for discipline).

The question, then, is whether Banks provided evidence that would allow a reasonable jury to conclude that Grady's proffered reason is false and masked retaliatory motives. *Gogel*, 967 F.3d at 1136. Banks has not come close to doing so.

Banks's sole argument on this score is that Johnson and Lescota did not have a good-faith belief that Banks was insubordinate. *See* Appellant Br. at 29–31. Banks, however, does not dispute that the April 30 meeting was justified. She acknowledges that the parties discussed multiple complaints in the April 30 meeting. ECF 103-2 (Grady SMF Banks) at 17–18, ¶¶78–81; ECF 106-9 (Lescota Dep.) at 103-106; ECF 106-1 (Banks Dep.) at 11–13, 18–21 ("Q. Okay. Tell me what you remember about that meeting. A. That was [April] 30th, in which they said something about complaints *and* IV administer - - or starting IVs.") (emphasis added). Banks also agrees that *they specifically discussed Chi*

*Chi's complaint.* ECF 106-1 (Banks Dep.) at 20 ("Q. Do you remember anything else being mentioned? A. The previous day with Ms. Chinenye, there was talking about that[.]"); ECF 106-9 (Lescota Dep.) at 106. And Banks *concedes that she contacted Chi Chi after the meeting.* ECF 103-2 (Grady SMF Banks) at 20, ¶84; ECF 104-1 (Banks SMF) at 13, ¶43.

Furthermore, Johnson and Lescota both testified that they instructed Banks not to contact any of the complainants. ECF 106-9 (Lescota Dep.) at 124 ("I asked her not to approach any of the associates that came forward and question them."); ECF 106-5 (Johnson Dep.) at 221 ("[Lescota] told [Banks], Do not go back and talk to any of these employees. Don't go back to ChiChi... [Lescota] told [Banks] do not make contact with them asking them about this situation."). Lescota's contemporaneous notes—written immediately after the interview—likewise state that Lescota "asked [Banks] not to approach any of the associates that came forward and question them. I asked her to promise that she would not do that." ECF 106-9 (Lescota Dep.) at 126; ECF 106-11 (Lescota Dep. Exhibits) at 288.

Meanwhile, Banks testified that, even though multiple complaints were discussed (including Chi Chi, whom she remembers discussing and

26

admits to contacting), she only remembers being instructed to not contact one of the complainants. ECF 106-1 (Banks Dep.) at 18–21, 25 ("Q. So you remember being told not to talk to Daniella [IV Complainant], but you don't remember being told not to talk to anyone about the allegations? A. Correct."). According to Banks, "[i]f the Court credits Banks's testimony, as it must at this stage, Johnson and Lescota are not telling the truth and did not sincerely believe the grounds for the adverse action." Appellant Br. at 30. This argument misses the point.

Banks's testimony on what was said at the April 30 meeting *is not inconsistent* with Johnson and Lescota's testimony. Banks did not testify that she was only forbidden from contacting a single complainant; instead, she testified that she only *remembered* being instructed to refrain from contacting a single complainant. ECF 106-1 (Banks Dep.) at 25 ("Q. So you remember being told not to talk to Daniella [IV Complainant], but you don't remember being told not to talk to anyone about the allegations? A. Correct.")[3]. Johnson and Lescota's testimony—

[3] In Banks's Statement of Material Facts, ECF 104-1 at 13, ¶42, she states "Banks was directed not to talk to Daniella Lewis following the meeting, who had made a complaint concerning Banks's IV starting skills, but was not instructed not to contact other individuals." Banks then cites her own deposition, ECF 106-1 (Banks Dep.) at 24:25-25:16, as supporting

that they instructed Banks to refrain from contacting *any* of the complainants—thus stands unrebutted.

Importantly, Johnson and Lescota's testimony is also corroborated by contemporaneous, documentary evidence. Lescota's notes were written immediately after the interview and state that she instructed Banks "not to approach any of the associates that came forward and question them. I asked her to promise that she would not do that." ECF 106-11 (Lescota Dep. Exhibits) at 288. In the face of this unrebutted, consistent evidence, no reasonable jury could find that Johnson and Lescota's stated reason for disciplining Banks was pretextual.

Furthermore, Banks's testimony on the April 30 meeting certainly is not inconsistent with Johnson and Lescota's testimony when examined through the lens of Johnson and Lescota's good-faith belief that they instructed Banks not to speak with any of the complainants. Again,

---

evidence. However, this deposition testimony does not state that she was forbidden only from contacting Daniella Lewis. The cited portion of Banks's deposition states only that this is all that she *remembers*. Because the record evidence does not support Banks's assertion in her Statement of Material Facts, the court is not compelled to resolve the inferences on that point in her favor. *Baxter*, 54 F.4th at 1253 (Court draws inferences "only to the extent supportable by the record[.]").

Banks's only evidence on this point is her single statement that she did not remember being told to refrain from contacting the other complainants. ECF 106-1 (Banks Dep.) at 25. And this solitary statement is *consistent* with Johnson and Lescota's honest and genuine belief that they told Banks not to contact any of the complainants. This is especially clear because Banks *admits* (1) that they talked about Chi Chi and at least one other complainant and (2) that Johnson and Lescota told Banks not to talk to the other complainant. *Id.* at 18–21, 25. Even accepting Banks's account that this is what happened, as unlikely as it is, it is entirely consistent with Johnson and Lescota's account that they mistakenly believed that they also told Banks not to contact Chi Chi.

The evidence supporting Johnson and Lescota's good-faith belief that they forbade Banks from contacting any of the complainants and, therefore, honestly believed Banks was insubordinate is overwhelming. Both Johnson and Lescota testified that they instructed her not to contact any of the complainants—even mentioning Chi Chi by name. ECF 106-9 (Lescota Dep.) at 124; ECF 106-5 (Johnson Dep.) at 221. And importantly, Lescota noted this *instruction* in her contemporaneous notes, ECF 106-9 (Lescota Dep.) at 126; ECF 106-11 (Lescota Dep. Exhibits) at 288.

29

Johnson does not dispute that Lescota contemporaneously made these notes immediately after the meeting, and there would be no reason for Lescota to fabricate them *before* Johnson's disobedience. These contemporaneous notes provide compelling and unrebutted support that Lescota and Johnson honestly believed that they instructed Banks to refrain from contacting any of the complainants.

Finally, for Banks to succeed in proving pretext, she must do more than overcome the overwhelming evidence establishing that Johnson and Lescota disciplined Banks because they genuinely believed that she disobeyed their direct instructions. She must also prove that the *actual* reason for the decision was retaliation. And there is no evidence that would permit a reasonable jury to make such a finding.

Banks does not dispute Lescota's statement that she and Fuller made the ultimate decision to issue the final written warning. ECF 106-9 (Lescota Dep.) at 135. And a reasonable jury could not conclude that these two decision makers would be motivated to retaliate against Banks for complaining about *Johnson*. Likewise, Banks has not impugned Lescota as having any discriminatory motive herself or even made a "cats-paw" argument that Johnson was working behind the scenes to

manipulate Fuller and Lescota into giving Banks the final written warning. Indeed, such an argument would not be available to Banks because Lescota was at the meeting with Banks, contemporaneously noted that she told Banks not to contact any of the complainants, and made the decision to issue the final written warning without Johnson's input or recommendation.

Further, Banks's assertion of retaliatory intent is made all the more implausible by the timing of events. Her theory is that Johnson plotted and lay in wait for five months (December 2019 to May 2020) for an opportunity to retaliate against Banks for complaining about her (even though Banks *does not dispute* that Johnson did not make the disciplinary decision here in the first place).[4] First, even setting aside the

_____

[4] Banks asserts that Lescota informed Johnson of the February 2020 complaints, but this is factually incorrect and unsupported by the record. First, both Johnson and Lescota dispute this. *See* ECF 106-9 (Lescota Dep.) at 87–88 (discussing generalized concerns); ECF 106-5 (Johnson Dep.) at 182 ("Q. Did Ms. Lescota tell you what the concerns were that were expressed to her in that [February 2020] meeting? A. No."). Banks's evidence to the contrary is unsupported by the record. In her Statement of Material Facts, she states that "Johnson met with Lescota and discussed the concerns that had been raised by the interview panelists to Lescota during a debrief" and cites a portion of the Johnson deposition. ECF 104-1 (Banks SMF) at 10, ¶33. However, the portion of the deposition cited by Banks does not provide any evidence that Johnson knew that the generalized concerns she discussed with Lescota came

other problems with this theory, there are no such "lie-in-wait" allegations in the complaint or in her briefing (at summary judgment or on appeal); any arguments on that score are thus unavailable to her now. *See, e.g., In re Blue Cross Blue Shield Antitrust Litig. MDL 2406*, 85 F.4th 1070, 1092 (11th Cir. 2023). But even if the argument were made, it would fail because of the five-month temporal gap. *Cf. Gilley v. Kelly & Picerne, Inc.*, No. 1:14CV124-SRW, 2016 WL 814885, at *14 (M.D. Ala. Feb. 29, 2016) ("Moreover, the close temporal proximity [of one or two days between complaint and adverse employment action] establishes pretext.").

Accordingly, because there is no evidence that would cause a reasonable jury to conclude that Johnson and Lescota's reasons for disciplining Banks were pretextual, the Court should affirm the district court's order granting summary judgment on Banks's claims.

---

from the panelists. Because the record evidence does not support Banks's assertion, the court is not compelled to resolve the inferences in her favor. *Baxter*, 54 F.4th at 1253 (Court draws inferences "only to the extent supportable by the record[.]").

**II.    Banks's constructive discharge claim further fails because she voluntarily resigned and was not presented with a choice between resignation or termination.**

Beyond her failure to provide evidence sufficient to permit a finding of pretext, Banks's constructive discharge claim fails for an additional, independently sufficient reason: She has failed to show that she was constructively discharged under this Court's precedents.

To establish that she was constructively discharged, an employee must show that "the work environment and conditions of employment were so unbearable that a reasonable person in that person's position would be compelled to resign." *Bryant v. Jones*, 575 F.3d 1281, 1298 (11th Cir. 2009). Employees are not guaranteed a "stress-free working environment." *Hipp v. Liberty Nat. Life Ins. Co.*, 252 F.3d 1208, 1233 (11th Cir. 2001). Accordingly, the threshold for establishing constructive discharge is high. *Id.* at 1231.[5]

Indeed, this Court has squarely held that it is not a constructive discharge when an employer gives an employee a voluntary choice

---

[5] Although *Hipp* is an ADEA case, the constructive discharge standard is the same. *Medearis v. CVS Pharmacy, Inc.*, 646 F. App'x 891, 898 n.4 (11th Cir. 2016) (citing *Walton v. Johnson & Johnson Servs., Inc.,* 347 F.3d 1272, 1282 (11th Cir.2003) ("The standard for constructive discharge is the same in both the Title VII and ADEA contexts.").

between a reprimand and resignation. "Part of an employee's obligation to be reasonable is an obligation not to assume the worst, and not to jump to conclusions too fast." *Beltrami v. Special Couns., Inc.*, 170 F. App'x 61, 62 (11th Cir. 2006). For this reason, an adverse action amounts to a constructive discharge *only* where the employer imposes an "impermissible take-it-or-leave-it choice between retirement or discharge." *Rowell*, 433 F.3d at 805. In other words, "the *possibility* that a plaintiff may not remain employed is not by itself enough to place a reasonable person in the position of 'quit or be fired.'" *Id.* at 806 (emphasis added).

Here, Banks was presented with a final written warning. By its own terms, and by her admitted understanding of those terms, Banks was not presented with an "impermissible take-it-or-leave-it choice between retirement or discharge." *Rowell*, 433 F.3d at 805. She still had the opportunity to continue working in her role, albeit with a temporary bar on promotions or transfers. Choosing to sign this written warning may have presented Banks with a stressful choice, but Title VII does not guarantee a "stress-free working environment." *Hipp*, 252 F.3d at 1233. As this Court has explained, "[r]esignations obtained in cases where an

34

employee is faced with such unpleasant alternatives are nevertheless voluntary because 'the fact remains that plaintiff *had a choice.* [Plaintiff] could stand pat and fight.'" *Hargray v. City of Hallandale*, 57 F.3d 1560, 1568 (11th Cir. 1995) (quoting *Christie v. United States,* 518 F.2d 584, 587 (1975) (brackets and italics in original)).

Instead of continuing to work at Grady, Banks resigned. That was her voluntary choice. Because such voluntary choices cannot give rise to constructive-discharge claims, the Court should affirm the district court's order granting summary judgment on Banks's constructive discharge for this reason as well.[6]

## III.   Sanusi's claims fail because she cannot establish that Grady's legitimate stated reasons were pretextual.

Like Banks's claims, Sanusi's claims fail because she has not provided evidence that would allow a reasonable jury to find that Grady's

---

[6] If the Court were to disagree and allow Banks's constructive discharge claim to proceed, the damages available to her should be limited under the after-acquired evidence rule. Because Grady has proven that Banks's status as a convict was against its Rules of Professional Conduct, ECF 106-4 (Sanusi Dep. Exhibits) at 31-35, and that it would have fired her had it known about her conviction, ECF 103-2 (Grady SMF Banks) at 3, ¶4, the after-acquired evidence rule should preclude her from obtaining reinstatement, front pay, and back pay for any time after her deposition. *Wallace v. Dunn Const. Co.*, 62 F.3d 374, 378 (11th Cir. 1995).

legitimate, non-discriminatory reasons for terminating her were pretextual. As explained above, whether analyzed under *McDonell Douglass* or the "convincing mosaic" framework, a Title VII claim can proceed to a jury only if the plaintiff provides sufficient evidence to find "not only that the employer's justification was pretextual, but that the real reason for the employment action was discrimination." *Tynes*, 88 F.4th at 944 (majority op.). Because Sanusi has failed to do so, the district court correctly granted summary judgment on her claims.

Sanusi was fired for poor work performance, insubordination, and failure to take responsibility for patient safety. ECF 101-2 (Grady SMF Sanusi) at 19, ¶88. The evidence that Sanusi's supervisors genuinely believed these multiple, independently sufficient reasons for termination is undisputed.

In March 2019, Sanusi was written up for sleeping on the job, a terminable offense. *Id.* at 2, ¶¶2–3. She also struggled with attendance, violating Grady's attendance policies seventeen times from April 2019 to November 2019. *Id.*, ¶4. On September 17, 2020, a doctor filed an incident report documenting that Sanusi failed to take the vitals of two new mothers for twelve hours. *Id.* at 14, ¶¶61–62.

36

During an investigation into the September incident, a Grady supervisor found that Sanusi lied: She "completed the shift assessments showing she had taken the blood pressures despite not actually doing so." *Id.*, ¶63. Lescota confirmed with the doctor that Sanusi had breached protocol based on his review of the events. *Id.* at 15, ¶68. Like the sleeping on the job infraction, Sanusi could have been immediately terminated for this offense and was not. *Id.*, ¶64.

Nearly two weeks later, on October 2, 2020, Sanusi was the subject of another incident report, this time for failing to immediately report a new mother's blood-pressure spikes as required by Grady policy. *Id.* at 16, ¶¶72–77. Sanusi admitted to helping another patient instead of immediately reporting the readings to the doctor, in violation of the policy. ECF 105-1 (Sanusi SMF) at 11, ¶¶35–36.

Additionally, when she returned to find a doctor in the new mother's room, Sanusi lied by claiming that the blood pressure readings on the machine were from other patients. ECF 101-2 (Grady SMF Sanusi) at 17, ¶79. In the subsequent investigation, the patient confirmed that the readings were hers because the machine had not been removed from her room. *Id.*, ¶80.

37

Sanusi does not dispute that she lied about which patient the readings belonged to and that the doctor's independent, contemporaneous incident report confirms that she lied about the machine. ECF 106-15 (Bennett Dep. Exhibits) at 20 ("When RN was confronted about issue, she lied and stated that none of the blood pressure readings on the machine in the patient's room belonged to the patient[.]"). Instead, Sanusi focuses on an irrelevant question concerning an incorrect clock. Appellant Br. at 24–25. But clock notwithstanding, the undisputed evidence proves that Sanusi violated Grady policy by not immediately reporting the high-blood pressure and then lied to the doctor about the machine's readings. This is in addition to the lies she told in September. ECF 101-2 (Grady SMF Sanusi) at 14–15, ¶¶63, 68. This undisputed evidence verifies and legitimizes Grady's reasons for firing Sanusi: poor work performance, insubordination, and failure to take responsibility for patient safety. *Id.* at 19, ¶88.

Because Grady has provided legitimate reasons for terminating Sanusi, the burden falls back onto Sanusi to prove that these reasons are pretextual and that discrimination or retaliation were the true motivation for her termination. *Gogel*, 967 F.3d at 1136. Because the

above evidence is undisputed and corroborated by documentary evidence from a third party, Sanusi cannot credibly argue that a reasonable jury could conclude that Grady's reasons were false *and* that retaliation or discrimination were the true reason that she was terminated. *Id.*

Further, in addition to the undisputed direct evidence, there is convincing circumstantial evidence proving that Grady's stated reasons for firing Sanusi are genuine. Following Sanusi's termination, Johnson—whom Sanusi paints as the discriminatory decisionmaker—texted her brother about the firing and discussed that Sanusi was terminated for patient care concerns and had nothing to do with discriminatory intent to "get rid of all the Africans." ECF 101-2 (Grady SMF Sanusi) at 21, ¶¶97–98. Johnson had no reason to know or suspect that these messages would be the subject of litigation. As such, they are persuasive evidence confirming Grady's legitimate justification behind Sanusi's termination.

In the face of her inability to meet Grady's legitimate reasons "head on and rebut [them]," *Gogel*, 967 F.3d at 1136, Sanusi relies on out-of-circuit case law to argue that her claims should still proceed to a jury because she has presented a "convincing mosaic" of pretext. Appellant Br.

at 35–36 (citing *Casagrande v. OhioHealth Corp.*, 666 F. App'x 491 (6th Cir. 2016)). *Casagrande* provides no such support.

In *Casagrande*, the Court concluded that, although a hospital raised legitimate reasons for terminating a nurse, the claim should still proceed to summary judgment because the nurse presented sufficient evidence from which a reasonable jury could conclude that the hospital's purported reasons for termination were pretextual. *Id.* at 500–01. The nurse argued that he was truly fired in retaliation for taking FMLA leave. *Id.* at 501. The Court concluded that, when combined, the nurse's evidence, including coworker testimony, evidence of increased scrutiny from the hospital, and the temporal proximity of the increased scrutiny following his return from FMLA leave presented enough evidence of pretext to pass summary judgment. *Id.* at 502. Here, Sanusi does not present anything approaching the same sort of circumstantial evidence.

Unlike the nurse in *Casagrande*, whose number of write-ups increased markedly following his return from leave, Sanusi's write-ups have been consistent throughout her time at Grady, spanning from March 2019 (sleeping on the job) through November 2019 (attendance problems) and culminating in September and October 2020 (patient

40

safety and lies to doctors). This consistent failure to meet standards does not have the same marked variance to indicate a "pattern" of increased scrutiny. *Id.* at 502.

Sanusi's write-ups were also more serious than those in *Casagrande*. In *Casagrande*, the nurse was written up for, among other things, failing to lock a medicine box and failing to pass out medicine to patients. *Id.* at 494. "[T]hese reprimands were not considered to be 'disciplinary.'" *Id.* The *Casagrande* court noted that this fact likened Casagrande's case to other circuit precedent where a genuine pretext had been established: "This activity is similar to the situation in [*Upshaw*] in which we held that the plaintiff established a genuine dispute of fact as to pretext when she showed, among other evidence, that two of the proffered reasons for terminating her employment typically did not warrant formal discipline or termination." *Id.* at 502 (citing *Upshaw v. Ford Motor Co.*, 576 F.3d 576, 590 (6th Cir. 2009)). Conversely, many of Sanusi's multiple infractions were very serious and could have resulted in immediate termination. ECF 101-2 (Grady SMF Sanusi) at 2, ¶¶ 2–3 (sleeping on job); 14, ¶62 (September incident report); 16, ¶¶72–77 (October incident report).

And finally, the *Casagrande* court also relied on the close proximity between the nurse's return from leave and the increase in write-ups to conclude that the return from leave was likely the true motivation behind the nurse's termination. *Id.* at 501–02 (three write-ups within three weeks of return). Here, Sanusi's fatal incident reports did not occur until at least 7 months after her February complaint to Johnson. Because Sanusi lacks the considerable circumstantial evidence present in *Casagrande*, that out-of-circuit decision is of no help to her here.

Rather than craft a convincing mosaic with evidence that neatly fits together to show retaliation, Sanusi's evidence of pretext is fragmented and incomplete. The critical gaps in Sanusi's "mosaic" mean that she has failed to provide any evidence that retaliation was Grady's true motivation. Because Sanusi cannot credibly argue that a reasonable jury could find that Grady's reasons were false *and* that retaliation or discrimination were the true reason that she was terminated, *Gogel*, 967 F.3d at 1136, this Court should affirm the district court's order granting summary judgment on Sanusi's claims.

42

## CONCLUSION

For the foregoing reasons, Grady Memorial Hospital Corp. respectfully requests that this Court affirm the decision below.

Respectfully submitted,

Dated: May 8, 2024                          s/ Leslie K. Eason

Leslie K. Eason                    Kian J. Hudson
*Counsel of Record*                BARNES & THORNBURG LLP
BARNES & THORNBURG LLP             11 South Meridian Street
3340 Peachtree Rd NE               Indianapolis, IN 46204
Suite 2900                         Telephone: 317-229-3111
Atlanta, GA 30326-1092             Email: kian.hudson@btlaw.com
Telephone: 404-264-4085
Email: leslie.eason@btlaw.com

*Counsel for Appellee Grady Memorial Hospital Corp.*

43

## CERTIFICATE OF COMPLIANCE

In accordance with Federal Rule of Appellate Procedure 32(g), I hereby certify that this Appellee Brief complies with the type-volume limitation of Federal Rule of Appellate Procedure 32(a)(7)(B) because, excluding the material exempted by Federal Rule of Appellate Procedure 32(f) and Eleventh Circuit Local Rule 32-4, it contains 7,990 words, as counted by Microsoft Word, the word processing software used to prepare this brief.

This Appellee Brief also complies with the typeface and type-style requirements of Federal Rules of Appellate Procedure 32(a)(5) & (6) because it has been set in a 14-point, proportionately spaced typeface (Century Schoolbook).

Dated: May 8, 2024                          <u>s/ Leslie K. Eason</u>

                                            *Counsel of Record*