# IN THE UNITED STATES COURT OF APPEALS
# FOR THE ELEVENTH CIRCUIT

---

CASE NO. 23-13376-F

---

SAMANTHA BANKS, ET AL.,
*Plaintiffs-Appellants*,

v.

GRADY MEMORIAL HOSPITAL CORPORATION,
*Defendant-Appellee*.

---

ON APPEAL FROM THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF GEORGIA
HONORABLE ELEANOR L. ROSS
CASE NO. 1:21-CV-00627-ELR

---

**REPLY BRIEF OF APPELLANTS SAMANTHA BANKS, ET AL.**

---

**Justin M. Scott**
**Georgia Bar No. 557463**
**RADFORD SCOTT LLP**
**160 Clairemont Avenue, Suite 610**
**Decatur, Georgia 30030**
**(678) 780-4880 | jscott@radfordscott.com**

**Counsel for Appellants Samantha Banks, et al.**

1

*Banks et al. v. Grady Memorial Hospital Corporation – No. 23-13376-F*

## CERTIFICATE OF INTERESTED PERSONS AND CORPORATE DISCLOSURE STATEMENT

Pursuant to FRAP 26.1 and Eleventh Circuit Rule 26.1, the undersigned counsel of record verifies that those persons or entities listed below have or may have an interest in the outcome of this case:

Banks, Samantha – Appellant/Plaintiff

Barnes & Thornburg LLP – Counsel for the Appellee

Cannon, Hon. Regina D., United States Magistrate Judge

Eason, Leslie – Counsel for Appellee

Gordon Rees Scully Mansukhani, LLP – Counsel for the Appellee

Johnson, Kian, J. – Counsel for Appellee

Monteiro, Tierra M. – Counsel for Appellants

Myers, Kimberly B. – Counsel for Appellee

Radford Scott LLP – Counsel for Appellants

Ross, Hon. Eleanor L., United States District Court

Sanusi, Amy – Appellant/Plaintiff

Scott, Justin M. – Counsel for Appellants

## <u>TABLE OF CONTENTS</u>

**CERTIFICATE OF INTERESTED PERSONS AND CORPORATE**

**DISCLOSURE STATEMENT** ................................................................**I**

**TABLE OF CONTENTS** ................................................................ **II**

**TABLE OF AUTHORITIES** ................................................................**III**

**ARGUMENT AND CITATION OF AUTHORITIES** ........................................**1**

    I.    GRADY ATTEMPTS TO CHANGE AN ADMITTED FACT AND ARGUES TESTIMONY CANNOT BE BASED ON MEMORY........................................................**2**

    II.    JOHNSON WAS A DECISIONMAKER FOR BANKS'S FINAL WARNING ..............**8**

    III.    THERE IS OVERWHELMING EVIDENCE OF RETALIATORY INTENT .................**11**

    IV.    A JURY COULD FIND CONSTRUCTIVE DISCHARGE. ......................................**17**

    V.    A JURY COULD CONCLUDE THAT JOHNSON FIRED SANUSI BECAUSE SANUSI IS AFRICAN.................................................................**20**

**CONCLUSION**................................................................**29**

**CERTIFICATE OF COMPLIANCE WITH TYPE-VOLUME LIMIT** .........**30**

**CERTIFICATE OF SERVICE** ................................................................**31**

ii

<u>**TABLE OF AUTHORITIES**</u>

**Cases**

*Anderson v. Liberty Lobby*, 477 U.S. 242 (1986) .................................................1, 6

*Beltrami v. Special Counsel, Inc.*, 170 F. App'x 61 (11th Cir. 2006) ....................19

*Calvert v. Doe*, 648 F. App'x 925 (11th Cir. 2016).................................................16

*Castro v. DeVry Univ., Inc.*, 786 F.3d 559 (7th Cir. 2015) ....................................29

*Cleveland v. Home Shopping Network, Inc.*, 369 F.3d 1189 (11th Cir. 2004)........25

*E.E.O.C. v. Standard Forge and Axle Co., Inc.*, 496 F.2d 1392 (5th Cir. 1974) ....20

*Hargray v. City of Hallandale*, 57 F.3d 1560 (11th Cir. 1995)...............................18

*Hutcherson v. Progressive Corp.*, 984 F.2d 1152 (11th Cir. 1993) .........................7

*Jones v. Suburban Propane, Inc.*, 577 F. App'x 951 (11th Cir. 2014)....................16

*Meeks v. Computer Associates, International*, 15 F.3d (11th Cir. 1994) ...............19

*Nguyen v. Gambro BCT, Inc.*, 242 F. App'x 483 (10th Cir. 2007) .........................29

*Penn. State Police v. Suders*, 542 U.S. 129 (2004) ................................................17

*Porter v. California Dep't of Corrs.,* 419 F.3d 885 (9th Cir. 2005).......................17

*Reeves v. Sanderson Plumbing Prods. Inc.*, 530 U.S. 133, 151 (2000) ...................7

*Rowell v. BellSouth Corp.*, 433 F.3d 794 (11th Cir. 2005).....................................18

*Sears v. Warden Okeechobee Corr. Inst.*, 762 F. App'x 910 (11th Cir. 2019) .........8

*Sorensen v. National R.R. Passenger Corp.*, 786 F. App'x 652 (9th Cir. 2019).....29

*Technical Coating Applicators, Inc. v. U.S. Fidelity and Guaranty Co.*, 157 F.3d 843 (11th Cir. 1998) ............................................................................20

*Tuft v. Wormuth*, 2021 WL 4076729 (4th Cir. Sept. 8, 2021)…...………………..16

*Tynes v. Florida Department of Juvenile Justice*, 88 F.4th 939 (11th Cir. 2023)....2, 20

*Vessels v. Atlanta Indep. Sch. Sys.*, 408 F.3d 763 (11th Cir. 2005).........................29

## ARGUMENT AND CITATION OF AUTHORITIES

Instead of defending the legal analysis Grady persuaded the District Court to adopt, Grady has elected to attempt to pivot and recast the facts and the record. No longer advocating for the application of the "honest belief" doctrine to address conflicts in material testimony, Grady now tells the Court – contrary to the record and its own prior representations – that there is no conflict in material testimony. As demonstrated below, that is false.

One consistency in Grady's briefing remains its zealous advocacy for the Court to resolve factual contradictions in its favor, choose to discredit Plaintiffs' testimony, and disregard Plaintiffs' evidence. That would not be a correct application of the law. At summary judgment, the non-movants' testimony must be believed, including when it contradicts the movant's, and all inferences drawn in the non-movants' favor. *Anderson v. Liberty Lobby*, 477 U.S. 242, 255 (1986).

Grady's misdirection on appeal necessitates a difficult and detailed slog through the record evidence and arguments to demonstrate the difference between what Grady says the record is and what it actually is. Appellants will endeavor to perform that task below.

Notably, Grady does not grapple with the many errors and omissions made at the District Court, including the District Court's misapplication of the "honest belief" doctrine, and the District Court's failure to realize that the decisionmaker

1

referenced Banks's protected activity when issuing the Final Warning, a fact recognized by the very Report and Recommendation ("R&R") it was fully adopting. The District Court's cursory assessment of the facts is compounded by its block-citing of pages of the R&R's one-sided and slanted factual recitation, in which, *inter alia*, the Magistrate Judge disregarded evidence of the decisionmaker's retaliatory animus towards Africans in part because the witnesses who heard the discriminatory statements were not African. Grady does not address this at all. Affirming summary judgment on this record would not be a faithful application of Rule 56 and is exactly the type of result counseled against by *Tynes v. Florida Department of Juvenile Justice*, 88 F.4th 939 (11th Cir. 2023).

## I.   Grady Attempts To Change An Admitted Fact And Argues Testimony Cannot Be Based On Memory.

The District Court granted summary judgment because it made a credibility determination that Grady's witnesses were telling the truth and Banks was not, and concluded that any difference in testimony did not matter because Grady honestly believed its explanation. Contrary to what Grady tells the Court now, Banks, Johnson, and Lescota provided diametrically different accounts of the critical instruction that Banks was given on April 30, 2020. Grady claims that Banks was issued a Final Warning because she violated a directive not to contact three individuals. As stated in Appellants' initial brief, Banks testified that she was instructed not to talk to Daniela Lewis, but was <u>not</u> instructed to forego contact

2

with two other individuals. [Doc. 106-1, p. 24-25]. Johnson testified that Banks was instructed not to "talk to any of these employees" and "don't go back to" "ChiChi" Ndukwe. [Doc. 106-5, p. 221]. Lescota testified that Banks was instructed not to talk to any of the alleged complainants. [Doc. 106-9, p. 124]. Lescota also testified that, at the time the Final Warning was issued, Banks denied that she had been given the challenged directive. [Doc. 106-9, p. 148].

Banks's alleged failure to follow this contested directive formed Grady's sole articulated basis for the adverse action. [Doc 106-9, p. 137; Appellee's Br., p. 11]. As detailed in Appellants' initial brief, the District Court failed to recognize that the material contradictions regarding the disputed instruction necessarily created a genuine issue of material fact and foreclosed Grady's "honest belief" defense. [*See* Appellants' Initial Br., p. 22-24, 27-33].

Impliedly recognizing the fatal flaw in the District Court's reasoning, Grady now attempts to use the manner in which its own counsel posed a deposition question to claim that Banks was only testifying about what she "remembered" instead of Grady's witnesses, who it seemingly posits were testifying based on something other than what they remembered. [Appellee's Br., p. 27-28]. This argument is frivolous. All testimony that is based on events occurring before the deposition is necessarily based on memory. Banks's testimony on the issue is

3

clear.  Grady's own counsel, who formulated the questions and is now making this

argument, fully understood Banks's clear testimony at the time and on the record:

> **Q.  Okay.  You don't recall being instructed not to talk to others about their complaints about you?**
>
> A.    <u>There were never any names provided to me about specific people, and who said what, except for Daniella Lewis.</u>
>
> **Q.    Okay.  You said there were never specifics of names provided to you?**
>
> A.    About specific complaints, yes, except my IV starting skills, Daniella Lewis.  That's what I -- yeah.
>
> **Q.    <u>So you remember being told not to talk to Daniella, but you don't remember being told not to talk to anyone about the allegations</u>?**
>
> A.    <u>Correct.</u>
>
> **Q.    Okay.  Let's assume that you weren't told that, I think the record will show otherwise, but why would you do it anyway?  Do you think it would be a good idea to talk to your subordinates about complaints about you?**
>
> A.    Could you repeat your question?
>
> **Q.    Yeah, sure.  <u>You said you were only instructed not to talk to Daniella, and that's fine</u>, I think the record will show otherwise, <u>but even if you weren't instructed to keep talks to -- not talk -- not to talk to people besides Daniella</u>, do you think doing so would be a good idea?**
>
> A.  I mean, that depends on the person.  I didn't have any complaints that I was concerned about, so I didn't talk to anyone about complaints.

[Doc. 106-1, p. 25-26] (emphasis added).  Banks provided an unambiguous response on the relevant issues, responded to the questions as Grady's counsel presented them, and Grady's counsel immediately understood that Banks had just provided testimony that she had only been instructed not to talk to Daniela Lewis.

In fact, Banks's testimonial denial that she was only instructed not to talk to one employee (Lewis) <u>was one of Grady's statements of material fact</u> in moving for summary judgment, which Plaintiffs admitted:

> [Grady SOMF NO.] 88. Banks admits that she was told she should not contact one of complaining employees during the pending investigation, but denies that she was told not to contact anyone else. (Banks Dep. at 24:25-25:16.)
> **Response to SOMF No. 88**: Admitted.

[Doc. 104-2, p. 41].  Accordingly, Grady now seeks to disclaim on appeal an admitted fact on which Grady relied in successfully moving for summary judgment.  Instead of attempting to persuade this Court that the District Court properly applied the law to the facts, Grady attempts to change the facts.

Grady's recasting of Banks's statement as "*not inconsistent*" with Grady's witnesses, who testified to the exact opposite, is absurd.  [Appellee's Br., p. 27]. (emphasis in original).  Unsurprisingly, Grady fails to provide any authority for the proposition that witness testimony that is based on memory is somehow unworthy of credence.

At the District Court, Grady never argued that Banks's testimony was "not inconsistent" with that of its own witnesses. Instead, it characterized the Magistrate Judge's analysis as follows: "…Judge Cannon examined Banks's assertion that she was only instructed not to contact *one* person. (Doc. 121 at 30.) She then quickly dispelled with this argument as immaterial and focused instead on what Johnson and Lescota believed." [Doc. 133, p. 6] (emphasis in original) Indeed, Grady told the District Court that, "Whether or not Banks was instructed not to contact one or any staff member is not material." [Doc. 133, p. 12].

While simultaneously arguing there is no conflict in testimony, Grady again here urges this Court to continue to conclude that Lescota and Johnson are telling the truth and Banks is not. In pursuit of this aim, Grady repeatedly and vociferously points to Lescota's allegedly contemporaneous notes from the April 30, 2020 meeting, which it claims support Lescota's version of events. [Appellee's Br. p. 9-10, 26, 28-31]. This is simply a request that the Court not credit Banks's testimony on the grounds that Lescota's version is buttressed by allegedly contemporaneous notes. Such credibility determinations may not be made at the summary judgment stage, and it is particularly important that they not be made in a manner adverse to Banks, in whose favor all inferences must be drawn. *Anderson*, 477 U.S. at 255; *Reeves v. Sanderson Plumbing Prods. Inc.*, 530 U.S. 133, 150 (2000); *Hutcherson v. Progressive Corp.*, 984 F.2d 1152, 1155 (11th Cir. 1993).

6

As to Lescota's notes themselves, despite Grady's many representations that they are "contemporaneous," and even assuming that Lescota is telling the truth about them being initially composed after the April 30, 2020 meeting, it is facially evident that they were later revised.  [Doc. 106-11].  The final paragraph on that one page of typewritten notes dated "4/30/20" states:

> Later that evening Tabitha received calls from Anika and ChiChi stating they got calls from Samantha. Anika stated Samantha asked her what she said to Tabitha because she was just attacked by Nicole and Tabitha in Tabitha's office.'  ChiChi did not respond to the call.

[Doc. 106-11, p. 288] (emphasis added).  People do not generally refer to events of the same day on by stating "that evening."

This document – quite obviously – was drafted at least in part after Johnson (who Banks had accused of discrimination) reported to Lescota at 7:39 p.m. on April 30, 2020 that Banks had contacted two employees, gave Johnson's opinion that "this is clear insubordinate behavior" and copied Deonte Fuller, the HR Manager who had conducted the discrimination investigation.  [Doc. 106-11, p. 289; 106-9, p. 129-131].  Lescota testified that she probably read Johnson's email the following day, [Doc. 106-9, p. 130-131], so there was necessarily at least a portion of the document that was not drafted contemporaneously with the April 30, 2020 meeting.

Further, Lescota's notes are not the sort of indisputable objective evidence (e.g., a hypothetical video recording of the April 30 meeting) which requires no

credibility determination. *See Sears v. Warden Okeechobee Corr. Inst.*, 762 F. App'x 910, 916–17 (11th Cir. 2019) (although "incontrovertible" objective evidence, such as video recordings, must be accepted over contradictory sworn statements at summary judgment, evidence like medical records are not the same "since those records involve people and all their attendant mental infirmities, biases, and limitations-in (*sic*) their creation.").

In any event, Lescota's notes do not change the critical point here: there is a genuine issue of material fact about the directive Banks was given that forms the sole basis for the adverse action. This cannot be decided by the Court at summary judgment and certainly cannot be decided in the movant's favor.

## II.    Johnson Was A Decisionmaker For Banks's Final Warning

Grady claims that Johnson was not a decisionmaker in the issuance of Banks's Final Warning. [Appellee Br., p. 11, 30-31]. This is not correct, nor is it supported by the record. In Grady's Interrogatory Responses, it states that Johnson "[p]articipated in the decision-making process" regarding the Final Warning. [Doc. 106-27, p. 16] And, indeed, of course she did. She raised the alleged insubordination to Lescota. [Doc. 106-11, p. 289; 106-9, p. 129-131]. She drafted the Final Warning. [Doc. 106-9, p. 138-140]. She and Lescota presented it to Banks in Johnson's office, in which meeting Johnson referenced Banks's discrimination complaint. [Doc. 106-5, p. 222-224, 232; Doc. 106-6, p. 49 (audio

recording); Doc. 106-9, p. 143-144, 150-152; Doc. 107 (audio recording); Docs.

120, 120-1 (transcript of audio recording); Doc. 106-1, p. 208-209].

Grady somehow claims that "…Banks *does not dispute* that Johnson did not

make the disciplinary decision here in the first place."   [Appellee's Br., p. 31]

(emphasis in original).   This, again, is utterly false.   Banks has consistently

maintained, based in large part on the evidence articulated immediately above, that

Johnson was one of the decisionmakers.   In Response to Grady's motion for

summary judgment, Plaintiffs stated:

> Lescota, Johnson, Fuller, and Earnest decided to issue Banks a Final
> Written Warning, which Johnson helped draft.

[Doc. 104, p. 12] (citations omitted).  Responding to Grady's Statement of

Material Facts, Plaintiffs stated:

> [Grady SOMF No.] 89. Johnson removed herself from the decision on
> what should have happened next. (Johnson Dep. at 211:2212:12.)
>
> **Response to SOMF No. 89**: Denied. Johnson participated in the
> decision-making process with respect to the decision to issued Banks
> a "final written reprimand." (Grady's Resp. to Int. No. 13). Johnson
> was the first manager to claim that Banks was insubordinate, the
> alleged justification for the final written discipline. (Lescota Depo.
> 129:14–130:16, Exh. 8). Johnson was also primarily responsible for
> creating the initial draft of the final written discipline …

[Doc. 104-2, p. 41-42].   In their objections to the Report & Recommendation,

Plaintiffs stated:

> In addition to calling the reference to Banks's protected activity
> during the issuance of the Final Warning "benign," the R&R brushes

aside Johnson's own testimony that she took Banks's complaints personally and felt that they were "an attack" against her (Second Johnson Depo. (Doc. 106-7) 44:14–45:5, 69:24–71:12). This is an admission from a decisionmaker–who brought up protected activity when issuing final discipline–that she felt personally attacked by that very same protected activity. … (Doc. 121 at 31).

[Doc. 128, p. 5]. In their initial brief before this Court, Plaintiffs explained:

Lescota, Johnson, Fuller, and Earnest decided to issue Banks a Final Written Warning, which Johnson helped draft. [Doc. 106-9, p. 138-139; Doc. 106-11, p. 290-292; Doc. 106-27, p. 16; Doc. 106-5, p. 214-217; Doc. 106-6, p. 44-46].

[Appellants' Br., p. 14].

The Magistrate and District Court agreed. As to Johnson's involvement in the Final Warning, the Magistrate Judge found: "… regarding the final warning itself – Johnson was, at most, jointly responsible for its issuance." [Doc. 121, p. 33]. The District Court identified Johnson as the decisionmaker and said it was unclear whether she was aware of Banks's complaints. [Doc. 135, p. 21-22, n. 3]. Fuller, the HR manager, testified that the discipline was a "joint effort" between Johnson and Lescota:

Q. To the best of your understanding, who made the decision to issue Ms. Banks' discipline?

A. Honestly, I feel like it was a joint effort between Tabitha [Johnson] and Nicole [Lescota] because they worked closely together as it related to anything with Samantha [Banks]. So I would say both.

[Doc. 106-18, p. 88].

Grady flatly misrepresents the record.

10

## III.    There is Overwhelming Evidence of Retaliatory Intent

Grady tells the Court there is no evidence of retaliatory intent.  [Appellee's Br., p. 30]  In reality, evidence of Johnson's retaliatory animus towards Banks is overwhelming.  It includes the following:

In the meeting in which Johnson and Lescota were delivering the Final Warning, Johnson referenced Banks's protected activity expressly.  She said:

> You know, when I went to HR -- okay. And I'm going there. When you reported that I was discriminating and that I was creating a hostile environment and when you -- when you reported me for those things, I had to bite my tongue and I had to allow them to do their investigation and I had to do my part and not come back to you because that's what was instructed of me.

 [Doc. 106-5, p. 222-224, 232; Doc. 106-6, p. 49 (audio recording); Doc. 106-9, p. 143-144, 150-152; Doc. 107 (audio recording); Doc. 120-1, p. 3].  <u>Again, the District Court found that it was unclear whether Johnson knew that Banks had complained about her when issuing the Final Warning.</u>  [Doc. 135, p. 21-22, n. 3]. There is no way to read the record with close attention and reach that conclusion.

Mr. Fuller, <u>Grady's HR Manager</u>, testified that he understood how Johnson's statement about Banks's protected activity in the May 6, 2020 meeting could be perceived as retaliatory and, if he had known about it, Johnson would have been subject to discipline up to and including termination.  [Doc. 106-18, p. 90–92] ("It would have resulted in investigation and a . . . corrective action for Tabitha leading up to termination.").  As to the investigation itself, despite Grady's claim that the

11

HR investigation "concluded that Banks's discrimination allegations were unsubstantiated" [Appellee's Br., p. 6], in fact, it was never concluded, and no final report was issued. [Doc. 106-16, p. 75-77, 84-85].

Johnson testified that, because of Banks's HR complaints, she thought that Banks was "against" her and that Banks's complaints were an attack against her:

> Q. No, ma'am, I know that. I'm asking you. Prior to Ms. Banks' resignation, did you think Ms. Banks was against you?
>
> A. You know, I had my thoughts.
>
> Q. What were your thoughts?
>
> A. Well, Justin, if you've been reported to HR four or five times, wouldn't -- do you think that person is for you or do you think that person is against you? What do –
>
> Q. So her –
>
> A. -- you think?
>
> Q. Her reporting you to HR four or five times made you think that Ms. Banks was against you?
>
> A. It -- it gave me that feeling, yes.
>
> ….
>
> Q. But you said you took it personally. And so what did you just mean by that?
>
> A. Like, I felt like it was a -- a -- an attack against me.

[Doc. 106-7, p. 44-45; 69-71].

In the months prior to the adverse action, Banks had felt the impact of Johnson's retaliatory antipathy towards her, both from Johnson and her allies. [Doc. 106-1, p. 114-115, 136; Doc. 106-22, p. 3-4, ¶¶ 13-15].   As of March 2020, prior to Lescota's promotion of her to Director, Johnson texted with a confidant that she wanted to make Banks reapply for her position.   [Doc. 106-7, p. 52-58; Doc. 106-8, p. 105-106].

Then, an elated Johnson then celebrated when Banks resigned:







Naphia

[Doc. 106-7, p. 46-51; Doc. 106-8, p. 100-101] (Johnson's "HELL YEAH!" image cut in Grady's document production).

Grady continues to insist that Lescota made the decision without Johnson and argues that there is no evidence that Lescota had a retaliatory motive, going so far as to say that "Banks has not impugned Lescota as having any discriminatory motive herself or even made a 'cats-paw' argument that Johnson was working behind the scenes to manipulate Fuller and Lescota into giving Banks the final written warning." [Appellee's Br. 30-31]. Grady's contention is false in virtually every conceivable way. First, as fully set forth above, Banks has repeatedly demonstrated that Johnson was a decisionmaker. Second and relatedly, Fuller himself testified that Johnson and Lescota made the decision. [Doc. 106-18, p. 88] Third, Banks has argued that Lescota had a retaliatory motive to terminate Banks who had complained about Johnson, the individual who Lescota had decided to

14

promote despite Lescota's knowledge of the discrimination complaints.    In opposition to summary judgment, Plaintiffs stated:

> Grady cannot claim Lescota's involvement acted as a panacea for Johnson's expressed retaliatory animus. Instead, the evidence, and certainly the reasonable inferences drawn from that evidence, show that Lescota and Johnson were working hand-in-hand to rid the Unit of the people who caused "trouble" on the Unit, as Lescota's predecessor put it, which unequivocally included Banks, originator of discrimination complaints. …

[Doc. 104, p. 20].

In fact, at the time Lescota was hired, former VP Linda Wildey – featured in Johnson's celebratory text message exchange above – had warned Lescota about Banks as someone who caused "drama and trouble" on the Unit, and Chief Nursing Officer Jacqueline Herd (Lescota's supervisor) told Lescota that the prior Director, Evelyn Laka, had tended to hire people from Laka's own country, which may have caused problems.   [Doc. 106-9, p. 27, 93-96, 176-177].

Finally, as to Grady's temporal proximity argument and its contention that retaliation cannot happen after five to six months (*i.e.*, as a matter of law, revenge can never be served cold), Grady is again wrong both on the record and on the law. Grady simultaneously claims that Banks's "theory is that Johnson plotted and lay in wait for five months … for an opportunity to retaliate against Banks for complaining about her" and that Banks never made such allegations in her complaint or in her briefing.  [Appellee's Br. p. 31-32].  Putting aside the question

15

of how Banks could have advanced a "theory" without ever previously raising it, Banks addressed the temporal proximity issue at length at the District Court level.

Temporal proximity is one way of showing causation; it is not the only way. Banks's actual allegations are that Johnson and her allies retaliated against her on an ongoing basis following her protected activity, and that retaliation successfully came to a head with the May 6, 2020 Final Warning. *See* Doc. 128, p. 10-13; *Calvert v. Doe*, 648 F. App'x 925 (11th Cir. 2016) (reversing summary judgment where retaliation occurred seven years after protected activity); *Jones v. Suburban Propane, Inc.*, 577 F. App'x 951, 955 (11th Cir. 2014) ("[I]f there was a significant time gap between the protected expression and the adverse action, the plaintiff must offer additional evidence to demonstrate a causal connection, such as a pattern of antagonism or that the adverse action was the 'first opportunity' for the employer to retaliate."); *Porter v. California Dep't of Corrs.,* 419 F.3d 885, 895 (9th Cir. 2005) (temporal delay due to fact that harasser unable to exact retaliation until promotion to supervisory position); *Tuft v. Wormuth*, 2021 WL 4076729, *2 (4th Cir. Sept. 8, 2021) (in cases where temporal proximity between protected activity and allegedly retaliatory conduct is missing, courts may look to the intervening period for other evidence of retaliatory animus) (quotation marks and citation omitted).

Here, there is a wealth of evidence that Johnson continued to harbor a retaliatory animus against Banks for a period of months and then, when given the opportunity, acted upon it, drawing the connection herself between Banks's protected activity and the retaliatory action.

## IV.    A Jury Could Find Constructive Discharge.

Grady misstates the applicable constructive discharge standard, selectively citing inapposite cases. The standard is whether the employer makes the working environment so intolerable that the employee's resignation qualifies as a fitting response. *Penn. State Police v. Suders*, 542 U.S. 129, 134 (2004). Banks need not show, as Grady suggests, that she was faced with a "take-it-or-leave-it" "resign or be terminated" proposition. [Appellee's Br. p. 22]. Grady misleadingly cites to *Rowell v. BellSouth Corp.*, 433 F.3d 794 (11th Cir. 2005) in purported support of this "resign or be terminated" paradigm. But *Rowell* discussed constructive discharge in the context of a reduction-in-force ("RIF") in which the plaintiff and others were offered severance as part of a voluntary RIF, plaintiff took the severance, was paid hundreds of thousands of dollars in severance and pension, and then sued. *Rowell*, 433 F.3d at 797, 805-07. In *that* RIF context, which had not previously been addressed by the Eleventh Circuit, this Court pointed out that the plaintiff was not forced to resign and could have declined the severance package and taken his chances as to whether he would be terminated. *Id*.

17

The Court's decision in *Hargray v. City of Hallandale*, 57 F.3d 1560 (11th Cir. 1995) involved the interplay of due process and constructive discharge for an employee who resigned to avoid the prospect of criminal prosecution for theft, and the employee maintained that he should have received a hearing. This Court found that the general rule is that an employee is faced with such unpleasant alternatives, an employee had a choice to "stand pat and fight" but that there was an exception where the employer "actually lacked good cause to believe that grounds for termination and the criminal charges existed." *Hargray*, 57 F.3d at 1568. To the extent that *Hargray* applies at all to this situation, there is a jury question here as to whether Grady lacked good cause to believe that grounds for the Final Warning existed.

The unpublished *Beltrami v. Special Counsel, Inc.*, 170 F. App'x 61 (11th Cir. 2006) decision, cited by Grady, is also inapplicable. In that case, after the plaintiff engaged in protected activity, the company "set forth a list of extremely difficult work objectives" for the plaintiff to accomplish within 30 days. *Beltrami*, 170 F. App'x at 62. The plaintiff "took no steps" to meet these objectives and, presumably, resigned. *Id.*, 62-63. There is no indication that the plaintiff actually suffered any adverse employment action. *Id.*

This case is far more similar to *Meeks v. Computer Associates, International*, 15 F.3d 1013 (11th Cir. 1994), cited by *Beltrami*. In *Meeks*, there

was sufficient evidence to find constructive discharge when the plaintiff was given a written warning and screamed at, with spit flying into her face. *Meeks*, 15 F.3d at 1015, 1021. Here, Banks was given a Final Warning, which impacted her employment status for an entire year, preventing from being promoted or transferring away from Johnson [Doc. 106-20, p. 52-58; Doc. 106-21, p. 22, 32], in a meeting in which Johnson expressly referenced Banks's protected activity. This Final Warning followed months of verbal abuse from Johnson and her allies. [Doc. 106-1, p. 114-115, 136; Doc. 106-22, p. 3-4, ¶¶ 13-15]. Another nurse, Janet Ricketts, also chose to resign when faced with written warning at the hands of Johnson. [Doc. 106-18, p. 95-96; Doc. 106-19, p. 46-47; 106-26, p. 1-3, ¶¶ 7-10]. There is enough evidence for a jury to conclude that Banks's resignation was a fitting response to Grady's retaliatory actions.

Lastly, the Court should reject Grady's gratuitous reference in a footnote to after-acquired evidence as a damages limitation, used as a vehicle to bring up Banks's criminal history from over 20 years ago. [Appellee's Br., p. 35 n. 6; Doc. 106-1, p. 80-81]. The District Court did not rule on the issue. *See E.E.O.C. v. Standard Forge and Axle Co., Inc.*, 496 F.2d 1392, 1394 (5th Cir. 1974) ("We decline to reach the merits of an issue on which the district court has not ruled.") (citation omitted); *Technical Coating Applicators, Inc. v. U.S. Fidelity and Guaranty Co.*, 157 F.3d 843, 846 (11th Cir. 1998) (same).

**V.    A Jury Could Conclude that Johnson Fired Sanusi Because Sanusi is African.**

Grady's purported recitation of facts regarding Sanusi is impressively false and misleading.  At the outset, there is Grady's general claim that Sanusi's tenure was "plagued by poor performance."  [Appellee Br., p. 12].  In fact, during her employment, Sanusi received ten nominations for the Daisy Award, Defendant's highest nursing award. [Doc. 106-23, p. 2, ¶ 3].    Grady tells the Court that in March 2019, approximately 19 months before her termination, Sanusi was written up for sleeping on the job. [Appellee Br., p. 12-13].  Sanusi disputes that she actually was sleeping on the job, [Doc. 106-3, p. 75-77], and Grady's own Disciplinary Action Form regarding Sanusi's termination makes no mention of this alleged event, nor does it mention attendance.  [Doc. 106-11, p. 317-318].

Regarding the relevant events of September and October 2020, Grady claims that, on September 17, 2020, Sanusi had completed shift assignments showing that she had taken the blood pressures despite not actually doing so, and that a doctor believed that she had breached protocol.  [Appellee's Br., p. 13, 37].  As Sanusi explained at the time, and has repeatedly explained in this case, these patients were not assigned to Sanusi but were instead assigned to a newly-hired but experienced nurse.  [Doc. 106-3, p. 229; Doc. 106-5, p. 258-260; Doc. 106-23, p. 5, ¶ 15].  Contrary to Grady's representations, there is <u>no evidence</u> to support Grady's contention that Sanusi lied about taking the blood pressures.  In alleged support for

20

this position, Grady cites its own statement of material fact, No. 63. [Appellee's Br. p. 13-14, 37, citing to 101-2, ¶ 63.]. This statement, in turn, refers to testimony from Naphia Bennett, and pages 192-195, and 213-214 of her deposition. [Doc. 101-2, p. 14, ¶ 63]. While there is testimony on the cited deposition pages about the applicable shift assessment, there is no testimony whatsoever that Sanusi lied about completing blood pressures. [Doc. 106-14, p. 192-195, 213-214]. The applicable report from the doctor, "RL Solution," also makes no mention of any alleged misrepresentation. [Doc. 106-15, p. 21]. This is simply another fabrication from Grady.

Grady's claim as to the September 2020 incident that "Lescota also confirmed with the doctor that, based on the doctor's review of the events, he believed Sanusi had breached protocol[,]" [Appellee's Br., p. 14] (emphasis added), is again, wholly false:

MR. SCOTT: Let's look at 9-17-20 please.

Q.     All right, ma'am. Do you see where it says, Amy did not assure the patients assigned to her vital signs were taken. Two patients assigned to Amy went 12 hours with no vital signs. Both patients were having increased blood pressures. A RL solution was input by M.D.

A. Yes.

Q. Did you personally do any independent investigation to prepare this summary?

A. No. I asked Tabitha to investigate it and report back.

21

Q. And you relied entirely on what Ms. Johnson reported back to you, correct?

A. That is her role as a leader, yes.

[Doc. 106-9 (Lescota Dep.), p. 198-199].

As to the October 2020 incident, as stated in Appellants' Initial Brief, on October 2, 2020, in accordance with Grady's protocol concerning patients with elevated blood pressure, Sanusi went to the patient's room after a technician recorded an out-of-range blood pressure for the patient, so that Sanusi could take a second blood pressure reading, which she then promptly took. [Doc. 106-3, p. 230-232; Doc. 106-23, p. 5-6, ¶¶ 17-18; Doc. 106-9, p. 235]. The patient's second blood pressure reading was still out-of-range, so Sanusi left the room to report the situation to the patient's doctor, in accordance with protocol, at which time Sanusi was called away briefly to another patient's room across the hall before she was able to call the doctor. [Doc. 106-3, p. 230-232; Doc. 106-23, p. 5-6, ¶ 18]. According to Grady: "Sanusi admits that she failed to follow this policy: She went to help another patient instead of immediately reporting the readings to the doctor, as required by Grady policy. ECF 105-1 (Sanusi SMF at 11, ¶¶ 35-36)[.]" [Appellee Br., p. 14, 37] However, the policy does not have any express time requirement for reporting a high blood pressure. [*See* Doc. 101-18, p. 3-5]. Sanusi was away for no more than five (5) minutes. [Doc. 106-3, p. 230-232; Doc. 106-23, p. 5-6, ¶ 18].

22

In reality, the problem arose because the doctor <u>mistakenly</u> believed that Sanusi had waited approximately four (4) hours to report the problem. [Doc. 106-3, p. 230-237; Doc. 106-23, p. 6, ¶ 19].  Sanusi tried to explain that the time on the blood pressure machine was wrong, which is exactly what she told Johnson when she was later questioned about it. [Doc. 106-3, p. 230-237; Doc. 106-23, p. 6, ¶ 20].  Johnson herself investigated and concluded that Sanusi was telling the truth about the time.  [Doc. 106-7, p. 37-41; Doc. 106-8, p. 87-88].  She terminated Sanusi anyway.  Recognizing the inherent problem with a decisionmaker knowing that the basis for termination was incorrect, Grady now claims that "…Sanusi focuses on an irrelevant question concerning an incorrect clock." [Appellee's Br., p. 38].

Sanusi focuses on the clock because, until now, Grady has focused on the clock. The alleged delay in reporting the blood pressure is why the doctor reported the issue and has been the primary reason Grady has consistently articulated for terminating Sanusi's employment.  The termination notice states that Sanusi was being terminated for not taking vital signs on 9/17/20, failing to notify a doctor of out-of-range pressures on 10-2-20, and "[w]hen asked for your statement on the above matters, you abruptly left the room in the midst of our conversation." [Doc. 106-11, p. 317].  As previously explained, at summary judgment, Grady abandoned the latter portion of this explanation (insubordination based on walking

23

out of the room) after Johnson testified that Sanusi did not actually leave the room in the midst of a conversation and was not insubordinate. [Doc. 106-5 at 277, 283; Doc. 106-23 ¶ 20]. On appeal, remarkably, insubordination has reappeared: "This undisputed evidence verifies and legitimizes Grady's reasons for firing Sanusi: poor work performance, insubordination, and failure to take responsibility for patient safety. *Id.* at 19, ¶88." [Appellee's Br., p. 38].

At the summary judgment stage, Grady claimed that Sanusi was terminated "because she failed to take the blood pressures of <u>two</u> new mothers followed by failing to follow lifesaving hypertension protocols a mere two weeks later." [Doc. 101-1, p. 14] (emphasis in original). Sanusi has fully rebutted both of these claims. Now, on appeal, Grady shifts the termination explanation <u>again</u>, asserting that Sanusi was terminated because she allegedly lied about which patient to which the blood pressure readings belonged, incredibly claiming, without citation that, "Sanusi *does not dispute* that she lied about which patient the readings belonged to." [Appellee Br., p. 15] (no citation). Grady's ever-shifting reasons can allow a jury to find that the real reason was discriminatory or retaliatory animus. *See Cleveland v. Home Shopping Network, Inc.*, 369 F.3d 1189, 1194 (11th Cir. 2004).

24

As to this newly-concocted termination justification, first, Sanusi has never admitted lying about the blood pressures, and the investigation proved that she was telling the truth about the incorrect clock.[1]  Second, there were, in fact, two blood pressure machines in the patient room.  [Doc. 106-3, p. 230-235].  Third, until the appeal, Grady never argued that it terminated Sanusi because she allegedly lied about which blood pressures readings were whose; it claimed it terminated her because she failed to notify the doctor and was insubordinate.  Grady's Initial Disclosures state:

> Finally, in October 2020, Plaintiff Sanusi had a patient with out of range blood pressures and she failed to notify the physician of the patient's pressures, which is a violation of acceptable nursing practices. This was a serious issue, which could have resulted in serious injury, harm, or death to the patient. During the investigation into the incident, Plaintiff Sanusi failed to cooperate, exhibited insubordinate behavior, and stormed out of the meeting with her director and another director. She was subsequently terminated.

[Doc. 106-28].  With respect to the statement Grady asked Sanusi to prepare about the incident, Grady claims that, "[w]hen Sanusi failed to prepare this statement, she was terminated."  [Appellee's Br., p. 1].  However, Grady made the decision to

---

[1] Grady makes this same false assertion later in its brief, this time citing to the original, disproven doctor's report, not to any testimony from Sanusi.  [Appellee's Br., p. 38].

terminate Sanusi before she could provide the requested statement, which she had prepared. [Doc. 106-23, p. 6-7, ¶¶ 21-22].

Grady convinced the District Court to dismiss Sanusi's claims despite these genuine issues of material fact, and notwithstanding the mountain of evidence of Johnson's discriminatory animus, on the grounds that it did not matter what actually happened, only what Grady believed happened. [Doc. 135 at p. 31]. As demonstrated in Appellants' initial brief, this is not the correct application of the "honest belief" standard because here, Johnson, who is unequivocally the decisionmaker, knew that Sanusi was telling the truth about the time that had elapsed on the blood pressure machine. [Doc. 106-7, p. 37-41; Doc. 106-8, p. 87-88].

As it did at the District Court level, Grady cites to Johnson's text messages with her brother on the day she fired Sanusi to purportedly demonstrate that Johnson said at the time she did not act with discriminatory motive. [Appellee Br. p. 17, 39]. The Magistrate Judge adopted this argument. [Doc. 121, p. 17–18, 44]. The District Court included the Magistrate Judge's factual findings about the text messages in its 11-page block quote without comment. Grady fails to mention that, in those same text messages, Johnson tells her brother that she has a gun on her to use if Sanusi waited for her; Johnson testified that *those* text messages in the same text string were not true. [Doc. 106-8, p. 75; Doc. 106-7, p. 33–34].

26

Based on Johnson's testimony, therefore, she lied to her brother in her October 6, 2020 text messages.

Johnson – the Unit Director and decisionmaker who knew that Sanusi was telling the truth about the blood pressure machine but fired her anyway before she could submit her statement – is the same person who:

- Stated that she would not hire any more African nurses and would reject resumes with "African-sounding names." [Doc. 106-1, p. 100; Doc. 106-24, p. 4, ¶ 12].

- Created a pie chart of the ethnicities on the Unit and presented it to other Unit leadership, stating that there were too many Africans on the Unit and it was time to dilute some of the Nigerians out.  [Doc. 106-1, p. 102-103; Doc. 106-24, p. 2-3, ¶¶ 7-8].

- Stated that the diversity of the Unit had to be "normalized" given the high percentage of non-Americans.  [Doc. 160-24, p. 2-3, ¶¶ 7-8].

- Stated that there were too many Africans on the Unit and some of them had to be gotten rid of.  [Doc. 106-24, p. 3, ¶ 9].

- Stated that certain non-American nurses needed to "go back to the bushes" or words to that effect.  [Doc. 106-24, p. 4, ¶ 14].

- Stated that she refused to share an office with a "loud, obnoxious Nigerian" or words to that effect. [Doc. 106-1, p. 113; Doc. 106-22, p. 3, ¶ 11].

27

- In her interview for the permanent Unit position, stated that she told HR to send her "diversity" because there was "too much of the same" on the Unit, which encompassed national origin and race, a problem from which she believed the Unit suffered. [Doc. 106-5, p. 176-180].

Viewing the evidence and the inferences to be drawn from it in Sanusi's favor, a reasonable factfinder could conclude that Johnson terminated Sanusi because she is African. *Tynes*, 88 F. 4th at 941, 946. Sanusi's claims must not be dismissed because, as the Magistrate Judge found, she failed to identify a comparator. *Id*., 944-48. And her claims cannot be waved away with scant analysis based on the "honest belief" doctrine simply because Grady manages to articulate a legitimate reason and professes to believe it. The decisionmaker, Johnson, knew that the reason lacked legitimate basis at the time. *See Vessels v. Atlanta Indep. Sch. Sys.*, 408 F.3d 763, 771 (11th Cir. 2005); *Sorensen v. National R.R. Passenger Corp.*, 786 F. App'x 652, 655 n.3 (9th Cir. 2019); *Castro v. DeVry Univ., Inc.*, 786 F.3d 559, 572 (7th Cir. 2015); *Nguyen v. Gambro BCT, Inc.*, 242 F. App'x 483, 490 (10th Cir. 2007). The entire evidentiary record must be considered – otherwise this meritorious claim will be dismissed without a fair evaluation that comports with Rule 56. *Tynes*, 88 F. 4th at 946-47.

## **CONCLUSION**

Plaintiffs respectfully request the Court reverse the District Court's decision on summary judgment.

Respectfully submitted this 27th day of June 2024.

*/s/Justin M. Scott*
Justin M. Scott
Georgia Bar No. 557463
RADFORD SCOTT LLP
160 Clairemont Avenue, Suite 610
Decatur, Georgia 30030
Telephone: 678.780.4880
Facsimile: 478.575.2590
jscott@radfordscott.com

Counsel for Appellants

## <u>CERTIFICATE OF COMPLIANCE WITH TYPE-VOLUME LIMIT</u>

Counsel for Appellants hereby certifies that this brief complies with the type-volume limitation set forth in FRAP 32(a)(7)(B).  This brief contains 6,480 words, excluding those parts exempted by 11th Cir. Local R. 32-4.

This brief complies with the typeface requirements of Fed. R. App. P. 32(a)(5) and the type style requirements of Fed. R. App. P. 32(a)(6) as this brief has been prepared in a proportionally spaced typeface using Microsoft Word in 14 point Times New Roman font.

RADFORD SCOTT LLP

*/s/ Justin M. Scott*
Justin M. Scott
Georgia Bar No.: 557463
jscott@radfordscott.com

## <u>CERTIFICATE OF SERVICE</u>

This is to certify that I have this 27th day of June 2024, filed this **Reply Brief of Appellant Samantha Banks, et al.** using the CM/ECF system which will automatically send e-mail notification of such filing to all attorneys of record.

*/s/ Justin M. Scott*
Justin M. Scott
Georgia Bar No. 557463
RADFORD SCOTT LLP
160 Clairemont Avenue, Suite 610
Decatur, Georgia 30030
Telephone: 678.780.4880
Facsimile: 478.575.2590
jscott@radfordscott.com

Counsel for Appellants
